Filed 2/6/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B242963 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA119971) |
| v. | |
| TRAVION JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Jr., Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Gary A. Liberman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

Travion Jones appeals from his judgment of conviction of first degree murder with personal firearm use and street gang allegations. We find no error and affirm.

In the published part of this opinion we conclude the trial court properly instructed the jury on the provocation doctrine as a basis for second degree murder. The balance of our discussion concerns claims of error based on a witness statement referencing appellant's prior prison incarceration, and the claim that application of the Penal Code section 12022.53, subdivision (d) firearm enhancement violates rules against double punishment and former jeopardy.

**FACTUAL AND PROCEDURAL SUMMARY**

This case arises out of two homicides among members of the same criminal street gang, the Grape Street Crips. No argument is raised concerning sufficiency of the evidence to support the jury verdicts, and in the following summary we follow the standard practice of reviewing the record in the light most favorable to the judgment, and "presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence. [Citation.]" (*People v. Lewis (*1990) 50 Cal.3d 262, 277.) We briefly summarize the evidence as necessary for discussion of the contested issues.

The Grape Street Crips is a large aggregation, numbering over 1,000 members. Many of its members live in the area of Jordan Downs, a public-assisted housing project in Los Angeles. The location is a high crime area and, as a result, is abundantly supplied with surveillance cameras. On an evening in August 2011, one of the gang members, Deshon Raspberry, was shot and killed by James Aubry, another member. Word had been out that Aubry thought Raspberry had stolen some of his narcotics and was selling it. According to another version, Antonio McNeil, another member of the gang, had stolen Raspberry's drugs, which somehow were acquired by Aubry. Raspberry and Aubry got into a physical fight during which Raspberry struck Aubry with a stick and, according to Aubry, said he was going to get a gun. Aubry then got his own gun and, when Raspberry returned, was afraid Raspberry was going to shoot him. As a result,

2

Aubry "went for his gun before [Raspberry] had time to get his," and shot and killed Raspberry. Aubry was arrested, but released based on his claim that he acted in self-defense. Appellant was a close friend of Raspberry. He was "disciplined" (beaten up) by his fellow gang members who learned that appellant was present when Raspberry was killed yet made no effort to come to his aid, and because appellant's explanation "wasn't adding up."

The day after Raspberry was killed, appellant appeared at the residence of his girlfriend with a swollen lip. He was upset at the killing of Raspberry, who had been a close friend. He was "kind of sad" and "cried a little bit." He received a phone call, then hurriedly left the residence in his girlfriend's car and went to the area where Raspberry had been killed. He spotted McNeil in the area. He said to Robert Anderson, an acquaintance who was there, "I'm about to kill that n-----." The acquaintance then left the area on a bicycle and did not witness the shooting. There had been talk that McNeil had given Aubry the gun used to kill Raspberry. When McNeil saw appellant he tried to run away. McNeil was chased by appellant. Shot by appellant, McNeil dropped to the ground. Appellant walked over and shot McNeil several more times, killing him. Videos taken from the surveillance cameras displayed the encounter, chase and shooting. As narrated by a detective while the jury viewed the film, it showed:

"Down here is the crowd that was gathered. You can see them reacting to something, kind of ducking and kneeling. There's the victim running in an eastbound direction between the buildings, stands behind the car over here. Here comes the suspect, chasing him. At this point, they're separated by the car and going back and forth in between the cars. And suspect and victim . . . kind of chasing each other around the car. Victim makes a run for it, and in a westbound direction he falls down between the buildings. To the east of the [parking] lot suspect approaches him, stands, extends out his arms, appears to be firing a gun a few more times. Stands extending his arm out. Suspect begins to walk and then run back in the same direction [from which he had come]." There was evidence that when McNeil saw appellant with a gun pointed at him, McNeil yelled, "It wasn't me. It wasn't me."

3

A neighbor, Marilyn Garcia, witnessed the shooting, and described it much as the video had displayed. She testified that after the shooting, the shooter looked directly at her and made a "mad face," then left. She got a good look at him at the time. She was able to recognize appellant as a resident of Jordan Downs, and when shown a photo lineup that included appellant's photograph, she said the picture "looks like the guy that did the shooting."

Appellant returned to his girlfriend's residence, and was fully packed and ready to leave when she returned. She drove him to San Bernardino, where he later was located and arrested.

Appellant was charged in a single count with murder (Pen. Code, § 187, subd. (a); all subsequent code citations are to the Penal Code), with allegations that the killing was committed by appellant's personal and intentional discharge of a firearm (§§ 667.6, subd. (c) & 12022.53, subd. (c)), and that the crime was committed for the benefit of and at the direction of a criminal street gang with the specific intent to promote, further and assist the criminal conduct of gang members (§186.22, subd. (b)(1)(C)). Appellant was convicted of first degree murder and the special allegations were found to be true. He received an aggregate prison sentence of 50 years to life. Appellant did not present a case-in-chief. He filed a timely notice of appeal.

## DISCUSSION

### I

Appellant argues that jury instructions on the doctrine of provocation were misleading because they did not, or did not explicitly, inform the jury that the objective standard applies only for reduction of murder to voluntary manslaughter, and does not apply to reduce first to second degree murder.

The jury instructions at issue are CALCRIM Nos. 520, 521, 522, and 570. The jury received them in written and oral form. In each form, the jury was instructed on the elements of first degree willful, deliberate and premeditated murder. It was informed that

4

a conviction of first degree murder requires satisfaction of these elements, each of which must be proven beyond a reasonable doubt.  The jury was instructed that if it found that appellant committed first degree murder it should sign and return the verdict form for that offense and not complete or sign any other form.  CALCRIM No. 522 instructed that provocation may reduce murder from the first to the second degree.  It informed the jury that if it concluded that defendant committed murder "but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."  CALCRIM No. 570, addressed reduction to voluntary manslaughter on the basis of provocation.  It provides:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

1. The defendant was provoked;

2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his/her reasoning or judgment;

AND

3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for the heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

5

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Thus, a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333 (*Hernandez*).) But more is required to reduce malice murder to voluntary manslaughter. For that, an objective test also applies: the provocation must be so great that, in the words of CALCRIM No. 570, it "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Appellant argues that these pattern instructions were likely to have misled the jury into concluding that the objective test applies both for reduction of first to second degree murder as well as from murder to manslaughter. The argument fails on several levels.

The first is that the instructions are correct. They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that "provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation"

6

(*Hernandez, supra*, 183 Cal.App.4th at p. 1334.) As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment.

There was no error in giving these instructions.

Which takes us to the second reason to reject the argument. What appellant is arguing is that a more specific instruction, actually a pinpoint instruction, should have been given informing the jury that the objective test did not apply to reduction of the degree of murder. (*Hernandez, supra*, 183 Cal.App.4th at p. 1333.) Defense counsel did not request such an instruction, and his failure to do so forfeits the claim on appeal. (*People v. Rundle* (2008) 43 Cal.4th 76, 151, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

To be sure, the result might have been different if the prosecutor had argued that an objective test applied to reduce murder from first to second degree. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129 [prejudice might be inferred where two alternative bases of guilt were presented to jury, one valid and the other not, and prosecutor stressed the latter].) This takes us to the third reason we disagree with appellant's argument: appellant did not rely on provocation at trial. In fact, as we next discuss, provocation was scarcely mentioned at all.

Recognizing that a pinpoint instruction on provocation was not requested, appellant argues that he was ineffectively represented by trial counsel. Not so. Counsel was free to argue that appellant's actions were the product of provocation based on the killing of Raspberry, in which he thought McNeil was complicit. He not only did not make that argument; he disavowed it. And understandably so.

First, there was little in the record to support it. Raspberry was a friend of appellant, his "best homey". And there was evidence that appellant was upset about the murder, and even cried "a little bit." But that was all. The killing of Raspberry had occurred the day before, and appellant had ample time to reflect and decide what to do.

7

He doubtless was upset after having suffered the disgrace of being disciplined by his gang for being present and not coming to Raspberry's aid when the killing occurred. After receiving a telephone call from someone, he left his girlfriend's residence, with a gun, and headed to the place where the Raspberry killing had occurred, and where McNeil was. He remarked to an acquaintance that he was going to kill McNeil, then proceeded to do so.

Second, defense counsel had two possible theories to present: provocation and mistaken identity. It would have been difficult to present both while retaining credibility with the jury. He chose the second, and presented evidence to support it as best he could. Given the evidence in the case, counsel cannot be faulted for not succeeding with what he had to work with, concentrating on weaknesses and inconsistencies in the identification evidence.

Although the jury had been instructed on provocation, the subject was hardly mentioned in argument. In opening statement defense counsel set out what he argued the evidence would show: while there was a video of the actual shooting, it did not identify the shooter, and Anderson, the acquaintance, was not to be credited because he said a lot of different things, one of which was he "wasn't even there. I didn't see anything." And in his closing argument, defense counsel told the jury that in opening statement he had said "what the evidence is going to show is that the shooter is not in this courtroom. That they will not be able to prove beyond a reasonable doubt that the shooter is in this courtroom. And I stand by that." Neither did the prosecutor dwell on provocation. She said, simply, that "[t]here's a voluntary manslaughter instruction thrown in there, and that has to do with the killing in the heat of passion. It's in there because the law says, you know, that you get this instruction. It's there for your consideration. But there is no evidence in this case and you haven't heard anything from the defense at all. Not that they have the burden to present anything. But we haven't heard anything to show that this was a killing done in the heat of passion from him having his best friend killed. The defendant went out that morning after a phone call, he acted coldly, he acted methodically, he acted to execute Antonio McNeil."

8

In short, provocation was not part of the defense. We have no occasion to discuss prejudicial error since there *was* no error.

## II

During direct examination of witness Anderson, the prosecutor asked how he knew Raspberry (using his street moniker, "Little Locci"). Anderson answered that they grew up together. Raspberry was a "kind of" relation to Anderson. Asked to explain, Anderson said, "My mother and his mother grew up together." Asked, "What about Third? How did you know him?" ("Third" was appellant's moniker), Anderson replied, "Went to school, and we was in prison together." This was followed by a discussion at sidebar, where defense counsel objected to the reference to appellant having been in prison, asked that the answer be stricken, and moved for a mistrial. The prosecutor stated that the answer was not what he was attempting to elicit from Anderson, that he thought it was understood that evidence of appellant's prison record had been stricken from documents presented in evidence, and she agreed that the answer should be stricken. The trial court announced that it was going to strike the answer and admonish the jury. It denied the motion for mistrial. It then instructed the jury: "The court's going to strike Mr. Anderson's last response with respect to Mr. Jones and how he knows Mr. Jones. So that's stricken and disregard that response for any reason whatsoever. Do not let it enter your discussions at all."

Appellant argues the harm already had been done and could not be undone. We do not agree. The court acted promptly and effectively. It repeated the admonition in its closing instructions, "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose." It is presumed the jury followed these instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) Finally, while jurors heard that appellant had been in prison, they heard nothing about the nature of the crime that caused him to be there; they knew Anderson had been in prison, and later learned that it was for a nonviolent drug offense. No basis for reversal has been shown.

9

### III

Appellant argues that the "super-weapons enhancement" provision in section 12022.53, subdivision (d), violates the rule against conviction for both a crime and a lesser included offense of that crime. This is so, he argues, because the crime of murder includes the element of death as does the enhancement, and McNeil died as a result of being shot to death. In a related claim, appellant argues that imposition of the enhancement violates the former jeopardy principle. Appellant recognizes that our Supreme Court has ruled against these claims in two recent cases, *People v. Sloan* (2007) 42 Cal.4th 110, 115, and *People v. Izaguirre* (2007) 42 Cal.4th 126, 130. He also recognizes that, as an intermediate appellate court, we are bound by decisions of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), but makes these arguments for purposes of preserving the claims for subsequent review. We are not persuaded but even if we were, as appellant recognizes, we are bound by controlling precedent.

### DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION


EPSTEIN, P. J.

We concur:


WILLHITE, J.                    MANELLA, J.

10