Filed 11/18/15  P. v. Davis CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071567 |
| v. | (Super. Ct. No. 11F01075) |
| MARCUS JAMAL DAVIS, | |
| Defendant and Appellant. | |

Defendant Marcus Jamal Davis shot and killed Chester Jackson after an altercation at a restaurant.  A jury convicted defendant of first degree murder and found true the allegations that defendant personally and intentionally discharged a firearm, proximately

causing great bodily injury or death to Jackson. The trial court sentenced defendant to an aggregate of 50 years to life in prison.

Defendant now contends (1) the trial court erred in instructing with CALCRIM No. 625 (voluntary intoxication: effects on homicide crimes); (2) the trial court erred in failing to instruct that even if there is insufficient provocation under an objective standard, defendant's subjective belief in the provocation could reduce first degree murder to second degree murder; and (3) the trial court abused its discretion in denying defendant's request for continuance so that defendant could retain private counsel to file a new trial motion based on ineffective assistance.

We conclude (1) the trial court's CALCRIM No. 625 instruction was a correct statement of the law, but in any event any instructional error was harmless; (2) there is no reasonable likelihood the jury understood that it could find defendant guilty of first degree murder without assessing his subjective state of mind; and (3) the trial court did not abuse its discretion in finding that defendant failed to demonstrate good cause for a continuance.

We will affirm the judgment.

BACKGROUND

Defendant twice moved from his table in a restaurant to an empty booth behind Chester Jackson and then talked on defendant's cell phone. A confrontation ensued. Jackson had the equivalent of six alcoholic drinks in his system. Defendant had at least eight alcoholic drinks over the course of the evening.

According to James Powell and Torrien Smothers, defendant "wanted to start something" when he aggressively said "what's up" to Jackson, Powell, and Smothers inside the restaurant. Defendant and Jackson said "what's up" to each other. Jackson told a friend, during a cell phone conversation, that he was "about to get into it" with some guys. Defendant and everyone at Jackson's table stood up. Powell was ready to hit

2

defendant if Jackson swung at defendant. But codefendant Robert Earl Lucas intervened, saying "it's good" or "it's cool."

Defendant, Lucas, and defendant's friend Mary McCain told a very different story. They said defendant moved from his table to a table behind Jackson to talk on his cell phone when he received a call from his girlfriend. Defendant claimed no words were exchanged between him and Jackson's group at that time. Defendant later returned to the table behind Jackson because he thought there was another call on his cell phone. This time, Jackson turned around and said "what's up" to defendant. Defendant answered "what's up" and returned to texting on his cell phone. Jackson asked defendant why defendant kept going over to the empty table. Defendant said he stood up when Jackson did. Then Jackson's friends also stood up. Lucas went over to see what was going on when he saw Jackson, Powell, Smothers and defendant stand up. Jackson asked why defendant was over in his area on the phone. Defendant replied, "what's the problem?" Lucas got between defendant and Jackson, Powell, and Smothers. Lucas told defendant to "keep cool." Lucas told Jackson and his group "is everything cool?" Jackson and his group answered everything was cool. Then Jackson left the restaurant with Powell and Smothers.

Unbeknownst to Lucas, defendant had walked out of the restaurant. Jackson walked out of the restaurant a few seconds behind defendant. Powell and Smothers were right behind Jackson. Jackson and defendant were fighting by the time Powell and Smothers walked outside. Smothers ran over and tried to break defendant and Jackson apart. Powell punched defendant twice in his side or back.

Lucas testified McCain asked him to get defendant, who had gone outside. Lucas saw Jackson and his group assaulting someone when he exited the restaurant. When he realized Jackson and his group were assaulting defendant, Lucas yelled at them to get off defendant.

A waitress heard raised voices outside the restaurant. She informed a manager there was a group of people fighting outside. The waitress and the manager did not see anyone with a gun. The manager did not see anyone with their hands up in the air.

But according to Smothers and Powell, Lucas pulled out a handgun when he exited the restaurant. Smothers said Lucas pointed the gun at Jackson, Powell, and Smothers. And Jackson, Powell and Smothers put up their hands and said, "It's cool. It's cool."

Powell said he ran away when he saw Lucas raise his gun. He maintained he did not see or hear any gunshots. Smothers, on the other hand, claimed Lucas shot in the direction of Jackson, Powell, and Smothers, and Powell and Smothers ran away after the shot was fired. Smothers claimed he ran back when he realized Jackson was not behind him, and he saw defendant point a handgun in Smother's direction and shoot four or five times. Smothers said he ran away again when those shots rang out.

Lucas testified he did not have a gun. He said he was one to two feet away from Smothers and about three feet away from defendant when he heard multiple gunshots. Lucas did not see anyone with a gun. He ran to his vehicle.

The restaurant manager ran to the front door of the restaurant when she heard about four gunshots fired in succession. She did not hear a single gunshot before she heard the multiple gunshots. She saw an African American man lying on the sidewalk and about four people running away. The manager saw a man she later identified as defendant walk toward the man lying on the sidewalk. According to the manager, defendant pulled out a gun as he approached the man on the sidewalk and stopped when he was one to two feet away from the man. The manager heard defendant say, "I told you this mother fucking shit was going to happen." The manager testified defendant pointed his gun at the head of the man on the ground. The manager heard one gunshot after she turned away. When she opened the door again, she saw defendant walking away from the restaurant.

4

Surveillance video showed a dark colored sports utility vehicle leave at a high rate of speed from the restaurant parking lot at about the time of the shooting. Lucas and McCain left in Lucas's black sports utility vehicle and were later joined by defendant. Defendant told Lucas and McCain, "they hit me in the jaw." He said someone "jumped" him and took his chain. Police found defendant's gold chain and medallion on the sidewalk in front of the restaurant. The chain was broken.

Jackson was unarmed at the time of the murder. He had multiple gunshot wounds to his head, face, shoulder, forearm, neck, hip, thigh, and chest area. A forensic pathologist opined that the wounds to the head, face and forearm were consistent with Jackson lying on the sidewalk and the shooter firing at Jackson from above. One of the gunshot wounds was inflicted when Jackson had his back to the shooter. Jackson died as a result of the gunshot wounds to his head and torso.

Police located a "live bullet," a bullet that had not been fired from a firearm, at the top of the stairs outside the front door of the restaurant. A live bullet can be expended from a semi-automatic firearm if the shooter "racks the gun" or cycles a live round into the firing chamber of the gun to prepare it for firing. A police detective opined the shooter was standing on the upper landing area of the restaurant when the "live bullet" was cycled out of the gun. Eight spent cartridges were also found at the front of the restaurant. All the cartridges were fired from the same semi-automatic firearm. Two 10 millimeter bullets were recovered from Jackson's body. The "live bullet" was the same caliber and brand as the bullets recovered from Jackson's body and the spent cartridges recovered at the scene.

Defendant and Lucas turned themselves in to police four days after the shooting. Defendant did not have any injuries on his face, head, or body at that time.

McCain told police defendant and Lucas both had guns on the evening before the shooting. At trial, however, McCain denied that she saw defendant or Lucas with a gun. But police found gunshot residue on the driver's side floorboard of Lucas's vehicle.

5

Defendant testified at trial. He admitted he shot Jackson. Defendant said he felt someone punch him on the right side of his jaw as he was leaning over the outside railing of the restaurant with his eyes closed. He then felt someone punch him from the back, grab him and rip his chain off. He thought someone was robbing him. Defendant said he did not know who was attacking him. He panicked and tried to pull his gun out of his waistband when he was at the top of the landing area outside the restaurant. He fired his gun as fast as he could until he had fired all the bullets. He intended to defend himself. Defendant denied making the statement that the manager testified she heard the shooter make.

Defendant said when the shooting stopped, he saw someone on the ground. He did not see anyone else shooting and did not see Lucas with a gun that night. Defendant ran away because he was frightened. He did not tell Lucas or McCain that he shot someone. He kept his gun hidden from Lucas. He later threw the gun away.

Lucas testified he had never seen defendant with a gun, and had no reason to believe defendant had a gun at the restaurant.

After a joint trial, the jury acquitted Lucas on all charges and lesser included offenses. The jury found defendant guilty of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The jury found true the allegations that defendant personally and intentionally discharged a firearm, proximately causing great bodily injury or death to Jackson. (§§ 12022.53, subds. (b), (c), (d).)

The trial court sentenced defendant to 25 years to life on count one and imposed an additional and consecutive 25 years to life sentence for the section 12022.53 allegation.

---

[1] Undesignated statutory references are to the Penal Code.

DISCUSSION

I

Defendant contends the trial court erred in instructing with CALCRIM No. 625 (voluntary intoxication: effects on homicide crimes). Specifically, defendant argues the trial court failed to instruct the jury that evidence of voluntary intoxication is relevant to his subjective state of mind for imperfect self-defense.

Defendant asked the trial court to instruct the jury with CALCRIM No. 625. Consistent with CALCRIM No. 625, the trial court instructed the jury: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. [¶] You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating affect [*sic*] or willingly assuming the risk of that affect [*sic*]. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

CALCRIM No. 625 is a correct statement of the law. (§ 29.4; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298 (*Timms*).)[2] Evidence of voluntary intoxication is admissible solely on whether the defendant actually formed a required specific intent or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. (§ 29.4, subd. (b).) Defendant did not ask the trial court to clarify or modify the CALCRIM No. 625 instruction. Defendant may not argue on appeal that an instruction correct in law was too general or incomplete and, thus, needed clarification, without first requesting such clarification at trial. (*People v. Rundle* (2008) 43 Cal.4th 76, 145, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th

---

[2] Section 22 was renumbered as section 29.4 with no substantive change effective January 1, 2013. (Stats. 2012, ch. 162, § 119.)

7

390, 421, fn. 22 ["Any lack of clarity regarding the consideration, if any, the jury should give to evidence of voluntary intoxication, in the absence of a request for an instruction on this subject, is of the defendant's doing, and on appeal he cannot avail himself of his own inaction."]; *People v. Cleveland* (2004) 32 Cal.4th 704, 750.)

Defendant nevertheless contends he may raise his claim of instructional error on appeal because the CALCRIM No. 625 instruction misstated the law and violated his constitutional right to due process. We have already explained that the CALCRIM No. 625 instruction was a correct statement of the law. In addition, defendant has not met his burden in establishing a due process violation. In any event, any instructional error was harmless.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.) Express malice is an intent to kill. (*People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).) Malice is implied when a person willfully commits an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. (*Id.* at pp. 941-942.) The killing of a human being with malice aforethought, willfulness, premeditation, and deliberation is first degree murder. (§ 189.) The killing of a human being with malice aforethought, but without willfulness, premeditation and deliberation is second degree murder. (§§ 187, 189.) Voluntary intoxication can negate express malice, premeditation, and deliberation and reduce a crime from first to second degree murder. (*People v. Lam* (2010) 184 Cal.App.4th 580, 585; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1376-1377; *Timms, supra,* 151 Cal.App.4th at p. 1298.)

Manslaughter is the unlawful killing of a human being without malice aforethought. (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter when he acts in a sudden quarrel or heat of passion or when he kills in unreasonable or imperfect self-defense. (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*);

8

*People v. Rios* (2000) 23 Cal.4th 450, 461; *People v. Lasko* (2000) 23 Cal.4th 101, 108.) One who kills while holding an actual but unreasonable belief that he is in imminent danger of death or great bodily injury and that it is necessary to defend himself (also known as imperfect self-defense) does not harbor malice aforethought and commits voluntary manslaughter, not murder. (*Elmore, supra*, 59 Cal.4th at p. 134; *In re Christian S*. (1994) 7 Cal.4th 768, 773.) Whether the defendant actually held the requisite belief for imperfect self-defense is to be determined by the trier of fact based on all the relevant facts, including the defendant's voluntary intoxication. (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783; *People v. Cameron* (1994) 30 Cal.App.4th 591, 601, superseded on another point by section 29.4.)

The trial court correctly instructed that evidence of defendant's intoxication was relevant to whether defendant acted with an intent to kill or deliberation and premeditation. (*Timms, supra,* 151 Cal.App.4th at p. 1298.) Regarding imperfect self-defense, the trial court instructed the jury that defendant acted in imperfect self-defense if he actually believed he was in imminent danger of being killed or of great bodily injury, or if he was in imminent danger of being robbed and he actually believed the immediate use of deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable. The trial court correctly stated that defendant was guilty of voluntary manslaughter, not murder, if he killed a person because he acted in imperfect self-defense. (*Elmore, supra*, 59 Cal.4th at p. 134; *In re Christian S.*, *supra*, 7 Cal.4th at p. 773.) The trial court told the jury to consider all circumstances as appeared to defendant in assessing whether defendant acted in imperfect self-defense. All circumstances as appeared to defendant would include a consideration of defendant's state of intoxication.

Defendant did not argue to the jury that his state of intoxication affected his belief in the need for self-defense. Further, there was compelling evidence defendant did not act in imperfect self-defense. The restaurant manager's testimony showed defendant

9

fired his gun at Jackson with the intent to kill Jackson, and defendant did not actually believe he was in imminent danger of death or great bodily injury when, after firing several shots at and injuring Jackson, he returned to where Jackson was lying on the sidewalk and fired a shot at Jackson's head while stating, "I told you this mother fucking shit was going to happen." Apparently, the jury found this account of the shooting more credible than defendant's account.

It is true that the prosecutor argued the jury could only consider voluntary intoxication in deciding whether defendant acted with intent to kill or acted with premeditation or deliberation and not for any other purpose. But the prosecutor made that statement in the context of arguing that defendant intended to kill Jackson. The prosecutor did not discuss voluntary intoxication in the context of imperfect self-defense.

For all of these reasons, any error in the trial court's instruction on voluntary intoxication was harmless even under the *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] standard. (*People v. Aranda* (2012) 55 Cal.4th 342, 367 [under *Chapman*, a federal constitutional error is harmless when the reviewing court determines beyond a reasonable doubt that the error complained of did not contribute to the verdict; reversal is required only when there is a reasonable possibility the error might have contributed to the verdict].) We do not consider defendant's ineffective assistance of counsel claim because we have considered the merits of his instructional error claim and conclude there is no prejudicial error.

## II

Defendant also argues the trial court erred in failing to instruct that even if there is insufficient provocation under an objective standard, defendant's subjective belief in the provocation could reduce first degree murder to second degree murder. He argues the instructions given to the jury -- CALCRIM No. 522 (provocation: effect on degree of murder) and CALCRIM No. 570 (voluntary manslaughter: sudden quarrel or heat

10

of passion) -- erroneously suggested an objective standard of provocation applied to reduce first degree murder to second degree murder.

In reviewing a claim that the court's instructions are misleading, we inquire whether there is a reasonable likelihood the jury understood the challenged instructions in the manner the defendant asserts. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).) We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions. (*Ibid.*) We interpret the instructions in a manner consistent with the judgment if the instructions are reasonably susceptible to such interpretation. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.)

As we have explained, heat of passion precludes the formation of malice aforethought and reduces an unlawful killing from murder to voluntary manslaughter. (*Beltran, supra*, 56 Cal.4th at p. 942.) The heat of passion requirement for voluntary manslaughter has subjective and objective components. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively." (*Ibid.*) The facts and circumstances must be sufficient to arouse the passions of an ordinarily reasonable person. (*Id.* at p. 1253.) "Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Beltran, supra,* 56 Cal.4th at p. 942; see *Steele, supra*, 27 Cal.4th at pp. 1252-1255.)

Heat of passion arising from provocation can also negate premeditation and deliberation and reduce a murder from first to second degree. (*Hernandez, supra*, 183 Cal.App.4th at p. 1332.) The test for whether provocation reduces the degree of a murder is subjective. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000 (*Jones*);

11

*Hernandez, supra*, 183 Cal.App.4th at p. 1332; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.) "The issue is whether the provocation precluded the defendant from deliberating. [Citation.] This requires a determination of the defendant's subjective state." (*Fitzpatrick, supra,* 2 Cal.App.4th at p. 1295.)

Here, even if defendant did not forfeit his appellate claim by failing to request clarification or amplification in the trial court,[3] based on our review of the instructions as a whole, we conclude there is no reasonable likelihood the jury understood that it could find defendant guilty of first degree murder without assessing his subjective state of mind. The jury was instructed on murder pursuant to CALCRIM Nos. 520 and 521. The trial court told the jury defendant committed murder if he committed an act that caused the death of a person, he acted with malice aforethought, and he killed without a lawful excuse or justification. The trial court explained express and implied malice aforethought. It also told the jury if defendant committed murder and he acted willfully, deliberately and with premeditation, defendant was guilty of first degree murder. Otherwise, defendant was guilty of second degree murder. The trial court explained the terms willfully, deliberately, and with premeditation.

Regarding the effect of provocation on the degree of murder committed, the trial court instructed with CALCRIM No. 522. The trial court said, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but [was] provoked, consider the provocation in deciding whether the crime was first or second degree murder. [¶]

---

[3] Compare *Jones, supra*, 223 Cal.App.4th at p. 1001 [failure to request a pinpoint instruction that CALCRIM No. 570's objective test did not apply to the reduction of the degree of murder based on provocation results in forfeiture] with *Hernandez, supra*, 183 Cal.App.4th at p. 1331, fn. 2 [declining to find forfeiture of the same appellate claim because asserted error affected the defendant's substantial rights].

Also consider the provocation in deciding whether the defendant committed murder or manslaughter."

Using CALCRIM No. 570, the trial court then instructed that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The trial court instructed that defendant killed someone because of a sudden quarrel or in the heat of passion if: (1) he was provoked, (2) as a result of the provocation, he acted rashly and under the influence of intense emotion that obscured his reasoning or judgment, and (3) the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. The trial court said, "In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. [¶] If enough time passed between the provocation and the killing for an ordinary person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

The instructions informed the jury of the necessary mental states for first and second degree murder and that provocation can reduce a murder from first to second degree. The jury was instructed that defendant was guilty of second degree murder if he killed with malice aforethought but was provoked. The term provocation in CALCRIM No. 522 is used in a non-technical sense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218.) Provocation means " 'to arouse to a feeling or action . . . [or] to incite to anger.' " (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.) "The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another . . ." (*People v. Ward* (2005) 36 Cal.4th 186, 215.) The jury would necessarily be required to evaluate defendant's subjective state of mind to determine whether he was provoked to act. The CALCRIM No. 522 instruction on reducing murder from first to second

13

degree does not contain an objective test for provocation. CALCRIM No. 570, which contains an objective test for provocation, dealt expressly and exclusively with provocation to reduce murder to voluntary manslaughter. (*Jones, supra*, 223 Cal.App.4th at p. 1001.)

The arguments to the jury did not suggest a contrary standard. The prosecutor said provocation necessary to reduce murder to voluntary manslaughter is evaluated under an objective standard. He explained provocation can also reduce first degree murder to second degree murder. The prosecutor did not argue an objective test applied to reduce murder from first to second degree. (*Jones, supra*, 223 Cal.App.4th at p. 1001 [finding no error in similar circumstance].) Defense counsel did not address whether an objective or subjective test applied to reduce the degree of a murder. In fact, defense counsel did not rely on provocation or heat of passion to argue that defendant committed second, rather than first, degree murder. Defendant's trial counsel argued instead that at most defendant was guilty of voluntary manslaughter.

Defendant claims the word "reduce" in CALCRIM No. 522 incorrectly implies that the jury may find defendant guilty of first degree murder and may then consider whether provocation reduces the murder from first to second degree. We disagree. The trial court instructed that in order to find defendant guilty of first degree murder, the jury must find defendant acted willfully, deliberately, and with premeditation. The trial court said a decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. Read with the instruction on first degree murder, CALCRIM No. 522 conveys " 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' " (*Jones, supra*, 223 Cal.App.4th at p. 1001; *Hernandez, supra*, 183 Cal.App.4th at p. 1334.) The jury would have understood the existence of provocation would support the absence of premeditation and deliberation and, thus, preclude a first degree murder finding. (*Ibid.*)

14

CALCRIM Nos. 521, 522 and 570 are not misleading when given together. (*Jones, supra*, 223 Cal.App.4th at p. 1001.) We do not consider defendant's ineffective assistance of counsel claim because we conclude there is no instructional error.

III

Defendant further asserts that the trial court abused its discretion in denying defendant's request for continuance so that defendant could retain private counsel to file a new trial motion based on ineffective assistance.

A defendant has the right to retain counsel of his choice as part of his right to effective assistance of counsel and due process of law. (*People v. Courts* (1985) 37 Cal.3d 784, 789-790 (*Courts*); *People v. Jeffers* (1987) 188 Cal.App.3d 840, 849 (*Jeffers*).) However, that right is not absolute. (*Jeffers, supra,* 188 Cal.App.3d at p. 850.) The right to counsel of one's choice " 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' " (*Courts, supra*, 37 Cal.3d at p. 790.)

Continuances are granted in a criminal proceeding only upon a showing of good cause. (§ 1050, subd. (e).) Such showing requires the party seeking a continuance to demonstrate that counsel and the party acted with due diligence. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1036; *People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*); *People v. Johnson* (2013) 218 Cal.App.4th 938, 942.) A trial court may deny a request for continuance if the defendant is unjustifiably dilatory in obtaining counsel. (*Courts, supra,* 37 Cal.3d at pp. 790-791; *Jeffers, supra,* 188 Cal.App.3d at p. 850.)

A trial court has broad discretion to determine whether good cause exists to grant a continuance. (*People v. Beames* (2007) 40 Cal.4th 907, 920; *Jenkins, supra,* 22 Cal.4th at p. 1037.) The trial court abuses its discretion only when it exceeds the bounds of reason, all circumstances being considered. (*Beames, supra,* 40 Cal.4th at p. 920.) The party challenging the trial court's denial of a motion for continuance bears the heavy

15

burden of establishing a clear abuse of discretion. (*Ibid.*; *People v. Froehlig* (1991) 1 Cal.App.4th 260, 265.) We look at the circumstances of each case, particularly the reasons presented to the trial judge at the time the request for continuance was denied, in deciding whether the trial court's denial of a continuance was so arbitrary as to deny due process. (*Courts, supra*, 37 Cal.3d at p. 791.)

The lateness of a request for continuance can be a significant factor justifying denial, absent compelling circumstances to the contrary. (*Courts, supra*, 37 Cal.3d at p. 792, fn. 4 [referring to eve-of-trial requests for continuance]; *Jeffers, supra*, 188 Cal.App.3d at p. 850.) Here, defendant had about a month to obtain private counsel before his sentencing hearing if he wanted to do so. Two days before the sentencing hearing, the trial court received a letter purportedly from defendant's mother stating defendant's family wanted a continuance of the sentencing hearing so that the family could retain counsel for a new trial motion. The letter says defendant was seeking a new trial based on ineffective assistance of counsel. Defendant did not sign the letter, and we cannot determine whether he received a copy of the letter. The letter does not explain the reason for the delay in notifying the trial court of a need for a continuance. (Contrast *Courts, supra*, 37 Cal.3d at pp. 795-796 [finding defendant was diligent in his efforts to apprise the trial court of his wish to find substitute counsel at the earliest possible time].) Defendant did not move for a continuance until the day of the sentencing hearing. No explanation was given for defendant's late request. The record on appeal does not contain any written notice to continue the sentencing hearing or show of good cause for defendant's failure to file a written notice.[4] The trial court could reasonably find under those circumstances that defendant's motion for a continuance was untimely.

---

[4] Section 1050 requires the party requesting a continuance to file and serve on all parties to the proceeding a written notice, at least two court days before the hearing sought to be continued, together with affidavits or declarations detailing specific facts showing that a

16

Moreover, unlike the defendant in *Courts*, defendant here did not demonstrate that he made a good faith, diligent effort to obtain counsel. (*Courts, supra*, 37 Cal.3d at p. 791.) The letter from defendant's mother does not describe what efforts defendant or his family members made to hire private counsel. No such information was presented at the sentencing hearing when defendant's trial counsel made an oral motion for a continuance. There was no indication as to when defendant formed the opinion that his trial counsel's representation was inadequate. There was no basis for the trial judge to conclude defendant was not responsible for the delay in obtaining private counsel. (Contrast *Courts, supra*, 37 Cal.4th at p. 792.)

Defendant's trial counsel said defendant and his mother were "in the process of retaining" an attorney in Berkeley, but had not yet retained that person. Defendant did not give the trial court any information about when defendant or his family would retain the Berkeley attorney or what was required to complete the process of retaining that attorney. Defendant attempts to place the burden on the trial court to elicit information regarding good cause for a continuance. But the burden was on defendant to affirmatively prove the grounds for his motion. (Cal. Rules of Court, rule 4.113; *People v. Stump* (1971) 14 Cal.App.3d 440, 442-443.) Denial of a continuance is proper where, as here, the prospect of hiring private counsel was still speculative at the time defendant moved for a continuance. (*Courts, supra*, 37 Cal.3d at p. 791, fn. 3; *People v. Pigage* (2003) 112 Cal.App.4th 1359, 1367 [no abuse of discretion in denying continuance to allow the defendant to seek private counsel where the defendant waited

continuance is necessary. (§ 1050, subd. (b).) A party may still make a motion for a continuance without complying with the requirements of subdivision (b). (*Id*. at subd. (c).) However, unless the moving party shows good cause for the failure to comply with those requirements, the trial court may impose sanctions against that party. (*Ibid*.) The trial court addressed the merits of defendant's motion for continuance without requiring defendant to show good cause for his failure to file the required written notice. We will do the same.

17

until the last minute to express concern about his appointed counsel's representation and there was no evidence the defendant attempted to retain counsel or had even taken steps to secure funds to hire private counsel].) *Courts* is distinguishable because in that case the defendant had actually retained his new attorney by the time he renewed his motion for a continuance. (*Courts, supra*, 37 Cal.3d at pp. 788, 791.)

The letter from defendant's mother states defendant would seek a new trial based on ineffective assistance of counsel. Defendant's trial counsel said the Berkeley attorney would need to see the transcripts to evaluate and prepare any new trial motion, and that defendant's mother indicated it would take three to four months. Defendant did not specify the potential grounds for a new trial motion based on ineffective assistance of counsel.[5] Unlike in *Courts*, no new attorney appeared at the hearing in this case. (*Courts, supra*, 37 Cal.3d at p. 788.)

Defendant claims the trial court denied his request for a continuance based solely on its observation that his trial counsel's in-court performance was competent. The record does not support that assertion. The trial court said defendant had almost a month to hire the Berkeley attorney and it did not appear the Berkeley attorney had been retained. The trial court denied defendant's motion for lack of good cause.

---

[5] The issue presented is not whether the trial court committed error under *People v. Marsden* (1970) 2 Cal.3d 118, but whether the trial court abused its discretion in denying defendant a continuance in order to secure private counsel. (*People v. Blake* (1980) 105 Cal.App.3d 619, 623.) In any event, no *Marsden* hearing was necessary because defendant did not move to substitute his appointed trial counsel for another appointed counsel. (*Courts, supra*, 37 Cal.3d at p. 795, fn. 9 [*Marsden* involved the substitution of appointed counsel for another appointed counsel].) The *Marsden* requirements are directed at preventing waste of public resources through duplicative representation at taxpayers' expense. (*People v. Ortiz* (1990) 51 Cal.3d 975, 986.) That concern is not present when a defendant wishes to replace appointed counsel with a privately retained attorney.

The trial court did not abuse its discretion in finding no good cause for a continuance. We do not address the merits of any new trial motion based on ineffective assistance of counsel because no such motion was presented to the trial court.

DISPOSITION

The judgment is affirmed.

_____/S/_____
Mauro, J.

We concur:

_____/S/_____
Hull, Acting P. J.

_____/S/_____
Duarte, J.

19