Filed 10/18/23  P. v. Serrano CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LEOPOLDO VARGAS SERRANO,<br><br>    Defendant and Appellant. | G061311<br><br>(Super. Ct. No. 00NF2672)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Levingston Bergman and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Defendant Leopoldo Vargas Serrano was found guilty of first degree murder and sentenced to 25 years to life in prison. On appeal, Serrano contends the standard jury instructions on provocation could have misled the jury into believing that provocation can reduce a first degree murder charge to a second degree murder charge only if the objective test is met; i.e., the provocation would have provoked a person of average disposition into a heat of passion. We conclude that any such instructional error was harmless. Additionally, the parties agree that the court erred in imposing certain fines because, in the pronouncement of judgment, the court waived those fees. We will remand for a reassessment of fees, but otherwise affirm the judgment.

FACTS

The events that gave rise to this case took place at Serrano's place of employment. Serrano worked there with his brother, as well as his wife and sister-in-law. The victim, Luis Bucio, also worked there along with multiple siblings.

Bucio and Serrano's brother (Brother) sometimes worked together at the same station on the factory floor. Initially, their relationship seemed friendly, and they even went on social outings together, but in the days before the killing their relationship grew tense. Bucio engaged in bullying behavior, such as making fun of Brother's eye condition in which one eye was crossed, pouring acid into Brother's gloves, and outright punching Brother.

In one incident a few days before the killing, Bucio grabbed Brother's hair and punched him. Afterward, Bucio told Serrano, "you're going to be the next one." Serrano responded, "I don't like problems, but I don't fight with my hands."

On the day of the shooting, about 15 minutes after a shift had started, Serrano approached his wife and had a quiet conversation that lasted one to two minutes. Afterward, his wife appeared to be worried and overwhelmed and looked like she wanted to cry. When a coworker asked Serrano's wife what was happening, she replied, "I have to go. I have to go." Serrano's wife immediately collected her belongings and walked over to her sister, and they both left. A coworker testified that she had never seen Serrano's wife collect her belongings and leave at the beginning of a shift.

R.M., who was ending his shift, witnessed the shooting. R.M. was ending his shift when he saw Bucio, Brother and Serrano walking out of the building. Seeing these three people walk outside at the start of their shift caught his attention. R.M. noted, "It was just some kind of a different behavior on all three" and "Nobody walks out of the job after they clock in." Once they were outside, R.M. noticed Brother had a small knife; Brother was holding it down. Bucio stood against the wall. R.M. could see his hands and did not see any weapons. He then noticed that Serrano was holding a handgun. Serrano stood about 10 to 12 feet away and faced Bucio. R.M. was standing about three feet away. Within seconds, Serrano lifted the gun and fired three or four shots at Bucio. R.M. saw blood come out of Bucio's chest. R.M. did not remember if Serrano or Brother said anything before the shots were fired. Bucio died at the scene.

R.M. saw Serrano and Brother go straight to their car, which had been parked right near the shooting. The two started to drive away with Serrano driving but then stopped and backed up to allow Serrano's wife and sister to get into the car. Meanwhile, R.M. ran back inside and yelled for someone to call 911 because somebody had been shot. After the shooting he never saw Serrano, Brother or the women at work again.

3

Serrano fled to Mexico, where his wife eventually joined him. A few years later, Serrano and his family moved to Texas. Approximately 20 years after the shooting, Anaheim detectives located Serrano in Texas. Serrano initially lied about his identity, but eventually admitted to it. At trial, Serrano's defense was misidentification: he argued that Brother was the shooter, not him.

The jury returned a somewhat mixed verdict. It found him guilty of first degree murder. However, it hung on whether Serrano had personally discharged a firearm causing death pursuant to Penal Code section 12022.53, subdivision (d). Afterward, Serrano admitted to a firearm enhancement under Penal Code section 12022.5, subdivision (a) (which does not require great bodily injury or death, and which carries a significantly shorter sentence enhancement). In sentencing Serrano, the court struck the firearm enhancement and sentenced him to 25 years to life in state prison on the murder count. Serrano timely appealed.

DISCUSSION

Serrano raises two issues on appeal: instructional error, and unauthorized imposition of fines and fees.

1. *Instructional Error*

Serrano's principal contention on appeal is that the court erred in giving instructions that could mislead the jury on the issue of provocation (i.e., heat of passion). According to Serrano, the given instructions failed to inform the jurors that in applying the concept of provocation to the distinction between first and second degree murder, it need only consider Serrano's subjective state of mind, rather than the objective test; i.e., how the provocation would have affected a person of average disposition. The objective test applies in deciding whether to reduce murder to manslaughter. We review claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) For the

4

reasons we explain below, we find no prejudicial error. Even assuming Serrano is correct that the existing instructions contain an ambiguity that could potentially confuse a jury, we find that it was harmless under the circumstances of this case because defense counsel did not argue provocation below, and there was no significant evidence of subjective provocation.

We begin with the instructions given to the jury. With regard to first degree murder, the jury was instructed, "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (See CALCRIM No. 521.) Next, the court gave a general instruction on provocation as follows: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (See CALCRIM No. 522.) Immediately afterward, the court gave the following instruction on provocation as it relates to manslaughter: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked.

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment.

5

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant was simply provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for an ordinary person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of [a] sudden quarrel or [in the] heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (See CALCRIM No. 570.)

Serrano does not contend that these instructions are incorrect statements of the law. Rather, he contends that their combined effect was to mislead the jury on an important legal principle: that the "person of average disposition" test is inapplicable to deciding between first and second degree murder. (See *People v. Jones* (2014) 223 Cal.App.4th 995, 1000 ["a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for

6

that degree of the crime"].)  According to Serrano, "The jury might well conclude that the defendant was subjectively provoked, but not be able to return a verdict of second degree murder because of its belief that provocation must be measured in terms of its impact on a person of average disposition, rather than on its impact on the defendant."

This argument was rejected in *People v. Hernandez* (2010) 183 Cal.App.4th 1327 (*Hernandez*). There, the defendant's argument was couched slightly differently, but was essentially the same.  The defendant argued "that CALCRIM No. 522 is inadequate because it does not specifically inform the jury that provocation is relevant to determine whether the defendant killed without premeditation and deliberation.  He points out that the CALJIC instruction on provocation [citation] included this point, stating: 'If the evidence establishes that there was provocation which played a part in inducing the unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, *you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation.*'"  (*Id.* at p. 1333.)  The *Hernandez* court began its analysis by noting that CALCRIM No. 522 is a pinpoint instruction, which a court is not required to give absent the defendant's request.  (*Hernandez,* at p. 1333; see *People v. Rogers* (2006) 39 Cal.4th 826, 878.)  The *Hernandez* court then reasoned, "[T]he fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruct on provocation without explicitly stating that provocation can negate premeditation and deliberation.  Although CALCRIM No. 522 does not expressly state provocation is relevant to the issues of premeditation and deliberation, when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept.  Based on CALCRIM No. 521, the jury was instructed that unless the defendant acted with premeditation and deliberation, he is guilty of second, not first, degree murder, and that a rash, impulsive decision to kill is not deliberate and premeditated.  Based on CALCRIM No. 522, the jury was instructed that provocation

7

may reduce the murder to second degree murder. [¶] In this context, provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term. [Citation.] Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.' [Citations.] Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez*, at pp. 1333-1334.)

Serrano criticizes *Hernandez* on the ground that the court failed to appreciate the distinct applications of the word provocation (i.e., objective versus subjective). Indeed, the *Hernandez* court did not consider the effect of CALCRIM No. 570 at all, which provides an extensive instruction on how to apply the objective test. Arguably, a jury that is instructed on the objective application of provocation, but not explicitly instructed on the subjective application of provocation, could be misled into believing that the objective test applies to both second degree murder and manslaughter.

However, we need not resolve that argument here because, even assuming there was some ambiguity in the instructions, we conclude that any such ambiguity was harmless under the circumstances of this case. Because the asserted instructional error here affected an element of one of the charges (i.e., deliberation and premeditation), we apply the standard of prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*See People v. Schuller* (2023) 15 Cal.5th 237, 251 ["*Chapman* review applies to instructional errors that 'misdescribe[]' [citation] an element of the charged offense or are otherwise 'incomplete and misleading' [citation] with respect to the findings necessary to prove an element of the offense"].) "'This "stricter" standard of review requires reversal unless the error is "harmless beyond a reasonable doubt."'" (*Ibid.*)

8

Even under this strict standard of prejudice, the asserted error was harmless for three reasons.

First, this case was not tried as a provocation case. Defense counsel did not argue provocation in his closing argument. This case was tried as a mistaken identity case i.e., that Brother shot Bucio, not Serrano. And that strategy paid off: it resulted in a hung jury on an enhancement that could have added an "additional and consecutive" 25 years to life sentence. (§ 12022.53, subd. (d).) That is potentially the difference between Serrano spending the entirety of his natural life in prison, versus getting out with a significant portion of his remaining life to live in the free world.[1]

Second, there was no significant evidence of subjective provocation. While it is reasonable to conclude that Serrano was motivated either by Bucio's threat to fight, or by Bucio's treatment of Brother, there is no evidence that he was in a heat of passion, i.e., reached a level of emotional intensity that interfered with his ability to deliberate. For example, there was no evidence of a harsh exchange of words between Serrano and Bucio prior to the shooting. There was no direct evidence of any emotional outburst or display from Serrano. The corroborated testimony was that Serrano's only comment to Bucio was, "I don't like problems, but I don't fight with my hands." That is not exactly an enraged statement. Moreover, on the day of the shooting, Serrano had a quiet meeting with his wife, presumably to warn her about what was impending, then he walked outside with Bucio. Again, no signs of emotion, and no evidence of actual subjective provocation.

---

[1] He was 49 years old at the time of sentencing.

Third, the asserted ambiguity is a quite nuanced point. Even if there is a latent possibility of confusion among the instructions, it would only occur where provocation is a significant issue in the case and there is a dispute about whether a person of average disposition would have been provoked. That is not this case at all. For these reasons, we are persuaded beyond a reasonable doubt that any error was harmless.

*2. Fines and Fees*

Serrano's second contention is that the court improperly imposed fines and fees. The argument boils down to this: at the sentencing hearing, the court orally pronounced, "The Court will waive all fines and fees." Yet in the abstract of judgment, the court imposed a $300 restitution fine, a $300 parole fine (suspended), a $40 court security fee, and a $30 criminal conviction assessment. The court's oral pronouncement of judgment controls over the minutes and abstract of judgment. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 387.) The Attorney General agrees that the court security fee and criminal conviction assessment should be stricken. However, the Attorney General contends that a restitution fine was mandatory absent compelling and extraordinary reasons that must be stated on the record but were not. (See § 1202.4, subd. (b).) Serrano agrees and contends we should remand the matter for the court to make such findings if it deems them appropriate.

Given the confusion, we agree with the parties that the prudent course is to simply remand the matter to the trial court to assess fines and fees consistent with its oral pronouncement of judgment, including making any additional findings it needs to make to support that judgment.

10

DISPOSITION

The imposition of fines and fees is reversed and the matter is remanded to the trial court with instructions to impose fines and fees, if any, consistent with its previous oral pronouncement of judgment, including stating any findings on the record necessary to support that judgment. In all other respects, the judgment is affirmed.


SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

11