Filed 4/7/21  P. v. Margo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057557 |
| v. | (Super. Ct. No. 16HF0034) |
| JACOB MICHAEL MARGO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jacob Michael Margo was charged with first degree murder for fatally shooting Octavio Alcala. At trial, appellant claimed self-defense, and the jury was also instructed on provocation with respect to the lesser included offenses of second degree murder and voluntary manslaughter. Rejecting these alternatives, they convicted appellant of premeditated murder with a firearm, and the trial court sentenced him to prison for 50 years to life. Appellant contends reversal is required because the jury instructions on provocation were flawed, the prosecutor committed misconduct in closing argument, and his trial attorney was ineffective. He also argues the trial court erred in imposing certain fines and fees without determining whether he had the ability to actually pay them. Finding appellant's arguments unmeritorious, we affirm the judgment.

FACTS

In 2015, appellant was 21 years old and living with his cousin Matthew at their grandmother's house in Santa Ana. Appellant's father Joseph lived in the same neighborhood, and so did the victim Alcala. Alcala was known as a heavy drug user with a penchant for petty thievery. So, when a bicycle went missing from Joseph's garage in late spring of 2015, appellant suspected Alcala was the culprit. In fact, appellant told his friend Marco Orozco that he wanted to kill Alcala for stealing the bike. However, appellant was unable to find Alcala in the wake of the theft. He went to Alcala's home and tried reaching him several times by phone, but all to no avail.

Then early one evening in June, appellant spotted Alcala unexpectedly. At the time, appellant and Matthew were hanging out in their neighborhood with their friend Patty Perez. They were planning on smoking marijuana and driving to the beach in Perez's Chevy Tahoe when they happened to see Alcala walking on a nearby sidewalk. Appellant confronted Alcala about the bike, and Alcala admitted taking it. He also agreed to get in the Tahoe and show appellant and his companions where he sold the bike. However, the bike was not at any of the locations Alcala directed them to, which

2

made appellant angry. After Perez stopped for gas, appellant took the wheel and started driving Alcala and the others toward Irvine.

Along the way, everyone in the vehicle smoked marijuana. Alcala, who was getting antsy, apologized for taking the bike, but appellant was not receptive to the gesture. He kept driving until they reached Orchard Hills, at which point he pulled over to the side of the road. When Matthew and Perez asked him what was going on, appellant said he was going to take Alcala for a little walk and "handle some business."

Appellant then had Alcala get out of the Tahoe and accompany him on a dirt path leading to a construction site. As they walked toward the site and disappeared out of view, Matthew and Perez stayed at the Tahoe, unaware of appellant's intentions. About 15 minutes later, Matthew got a call from appellant. Appellant did not reveal the fact he had just shot and killed Alcala with a .32 caliber revolver. Instead, he simply asked to be picked up at a nearby intersection. When Matthew and Perez arrived at the intersection, they asked appellant where Alcala was. Appellant said he had "handled" Alcala, whom he referred to as a "fucking mayate."[1] He also said Alcala was in a "better place now." Perez noticed appellant had a little dust on his pants and a small cut on his middle finger, but other than that, he did not appear dirty or disheveled.

By that time, it was getting dark. The trio picked up some fast food and headed to Moss Point at Laguna Beach. There, appellant walked off by himself while Matthew and Perez ate their food on a lifeguard tower. Appellant emptied the shells from his revolver into the ocean, and then he threw his gun and shoes into the water as well.

Later that evening, after Perez dropped off Matthew and appellant at their home, appellant went over to his friend Orozco's house. While they were smoking marijuana, he said he had killed Alcala. He explained he shot Alcala, and while Alcala was screaming in pain, he finished him off with brass knuckles.

---

[1] "Mayate" is a derogatory Spanish word used to describe people with dark skin.

3

The next morning, Alcala's body was discovered by workers at the construction site. He had gunshot wounds to his left cheek, upper left arm and right temple. There were multiple lacerations on his forehead.

In the days following the shooting, appellant told Perez to clean her Tahoe and get rid of her steering wheel cover. Perez didn't know what to make of appellant's odd behavior. At one point, she asked him point blank what happened to Alcala. Appellant said he beat him up and then shot him because he refused to die.

Although none of appellant's confidants went to the police, investigators were eventually able to tie appellant to Alcala's death through DNA evidence and phone records. In early 2016, seven months after the killing, they arrested appellant for murder. At trial, the defense presented evidence Alcala had a large quantity of methamphetamine in his system when he died. In addition, they presented expert testimony that methamphetamine can cause a person to feel anxious, paranoid and hyperactive.

Appellant also took the stand at trial. He testified that while mad at Alcala for stealing the bike, he never intended to kill him. Rather, the reason he took Alcala out to the construction site was to teach him a lesson; he wanted to abandon Alcala there and make him walk home as punishment for his thievery. However, when he told this to Alcala at the site, Alcala got violent.

According to appellant, as he turned to leave, Alcala grabbed his arm and tackled him. Then Alcala got on top of him and started choking him. Unable to get free, appellant reached for the gun in his waistband.[2] He couldn't reach the handle, but he was able to grab the barrel of the gun and hit Alcala with the weapon. In response, Alcala tried to seize the gun. As they were fighting over it, it went off once, but no one was hit, and the struggle continued.

---

[2] Appellant testified he always carried a gun for protection because he lived in a rough neighborhood and sold marijuana from time to time.

4

With Alcala still on top of him, appellant grabbed a rock and began hitting him on the head with it. After several blows, Alcala finally relented, and appellant was able to get to his feet with the gun. He stepped back and told Alcala "that's enough," but Alcala came charging at him. Fearing for his life, appellant pulled the trigger several times, and Alcala fell dead. Appellant then dragged his body down an embankment into the bushes. He never called the police because he feared they might not believe he acted in self-defense. Nor did he tell any of his friends that is why he killed Alcala.

In closing arguments, the prosecutor asserted appellant was guilty of first degree premeditated murder for deliberately "executing" Alcala. Defense counsel, on the other hand, spent most of her time arguing self-defense. While she acknowledged the lesser included offense of voluntary manslaughter, she contended appellant was not guilty of any crime because he killed Alcala in order to protect himself. The jury did not see it that way. It convicted appellant of first degree murder with a firearm.

DISCUSSION

*Jury Instructions on Provocation*

In light of appellant's testimony that he shot Alcala after Alcala attacked him and they fought over the gun, the trial court instructed the jury on provocation in connection with the lesser included offenses of second degree murder and voluntary manslaughter. Appellant does not dispute those instructions properly explained how provocation can reduce murder to voluntary manslaughter. However, he contends they were inadequate in terms of explaining how provocation can reduce first degree murder to second degree murder. We disagree.

"In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. [Citation.] We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and

correlating all the instructions. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

Appellant's jury received multiple instructions on murder, manslaughter and provocation. Per CALCRIM No. 520, it was told that if a killing is murder, it is murder in the second degree "unless the People have proved beyond a reasonable doubt that it is murder in the first degree as defined in CALCRIM No. 521." In turn, CALCRIM No. 521 explained, "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.)

The trial court also gave CALCRIM No. 522, which is at the heart of appellant's claim of error. That instruction informed the jury, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (CALCRIM No. 522.)

Next, the court gave CALCRIM No. 570, a detailed instruction on how provocation can reduce murder to manslaughter. In relevant part, the instruction explained, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: One, the defendant was provoked; two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and three, the provocation would have caused a person of average

6

disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM 570.)

While this instruction explained how provocation can reduce murder to manslaughter, the jury was not given any specific instructions on how provocation can reduce the degree of murder. Rather, the jurors were simply told, per CALCRIM No. 522, that provocation can reduce first degree murder to second degree murder and that the weight and significance of any provocation was for them to decide.

Appellant contends the trial court should have augmented CALCRIM No. 522 to cure this perceived shortcoming. In particular, he argues the court should have explained that while the provocation necessary to reduce murder to manslaughter is judged by an objective standard, i.e., the provocation must be such as to cause "a person of average disposition to act rashly and without due deliberation," the provocation necessary to reduce the degree of murder is judged by a subjective standard. In fact, the law is clear on this point: Whereas an objective test controls the issue of whether provocation can reduce a murder to manslaughter, "a subjective test applies to provocation as a basis to reduce [] murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000-1001.)

Appellant's jury was never explicitly instructed that a subjective standard of provocation governs the issue of whether a murder in the first degree should be reduced to second degree murder. Because of this, appellant surmises the jury would have been inclined – innocently, but incorrectly – to use the objective standard of provocation provided in the manslaughter instruction in affixing the degree of his murder. The Attorney General disagrees. He maintains the instructions on provocation were full and correct when viewed in conjunction with all of the other instructions that were given.

7

He also asserts appellant forfeited his right to challenge the sufficiency of CALCRIM No. 522 on appeal because, rather than objecting to it in the trial court, he actually urged the trial court to give it to the jury.

The record shows appellant's attorney did in fact ask the court to give CALCRIM No. 522. However, irrespective of the parties' requests, the trial court has an independent duty to ensure the jury is correctly instructed on the law. (*People v. Williams* (2009) 170 Cal.App.4th 587, 638–639.) Because the alleged failure of CALCRIM No. 522 to adequately explain the concept of provocation implicated appellant's right to have the jury properly instructed on the legal principles applicable to his case, we will address the merits of his claim. (*People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

As it turns out, however, appellant's claim does not hold water. While the jury was never explicitly instructed to apply a "subjective test" in deciding the degree of appellant's murder, the given instructions *required* the jury to assess appellant's subjective state of mind in resolving that issue. Those instructions (as well as the parties' closing arguments) made clear that premeditation and deliberation were essential elements of the prosecution's first degree murder theory. And those elements were defined in such a way as to require the jury to assess appellant's subjective mental state at the time of the killing. In particular, the jurors were told that in deciding whether appellant acted with premeditation and deliberation, they had to determine whether "he carefully weighed the consequences for and against his choice . . . to kill," and whether "he decided to kill before completing the acts that caused death." (CALCRIM No. 521.) The jurors were also instructed, "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (*Ibid*.) This instructional framework made it clear appellant's subjective state of mind was the central issue in deciding whether he was guilty of first or second degree murder. We do not think it was

8

necessary for the trial court to modify CALCRIM No. 522 to again make this point to the jury.

Nor was the trial court required to contrast the subjective test applicable to deciding how provocation can affect the degree of murder with the objective test applicable to deciding how provocation can affect whether appellant was guilty of murder or manslaughter. As explained above, that objective test was explained to the jury in CALCRIM No. 570. Because that instruction pertains specifically and strictly to how provocation can reduce murder to manslaughter, it is not reasonably likely the jury used it in deciding the degree of appellant's murder.

Case law fully supports these conclusions. In fact, as appellant admits, several decisions have held that, when considered in combination with each other, CALCRIM No. 522 and the standard instructions on first degree premeditated murder that were given in this case adequately explain how provocation can impact the defendant's subjective intent so as to reduce his culpability from murder in the first degree to murder in the second degree. (*People v. Jones, supra,* 223 Cal.App.4th at pp. 999-1001; *People v. Hernandez, supra,* 183 Cal.App.4th at pp. 1331-1335; see also *People v. Rogers* (2006) 39 Cal.4th 826, 879-880 [CALJIC No. 8.73, the predecessor to CALCRIM No. 522, is a pinpoint instruction that need not be given sua sponte because the principles it sets forth are embodied in the instructions on premeditation and deliberation]; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1293-1296 [discussing CALJIC No. 8.73].)[3]

---

[3] CALJIC No. 8.73 states: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation." In this case, the prosecutor urged the trial court to give this instruction in lieu of CALCRIM No. 522 because it expressly relates provocation to the essential elements of first degree murder, i.e., premeditation and deliberation. However, the trial court believed CALCRIM No. 522 adequately explains this relationship, and, for the reasons set forth above, so do we.

9

Given that the courts have consistently rejected his attack on CALCRIM 522 and the provocation instructions used in this case, appellant attempts to repackage his argument in different terms. Relying on a standard tenet of instructional law, he contends the trial court had a sua sponte duty to define the term provocation because it has a technical meaning peculiar to the law. (See generally *People v. Estrada* (1995) 11 Cal.4th 568, 574-575 [trial courts must clarify the meaning of terms used in jury instructions if their legal meaning differs from the meaning ascribed to them in common parlance].)

However, when used as a mitigating factor to the crime of murder, provocation does not have a technical meaning peculiar to the law. As the court explained in *People v. Hernandez, supra*, provocation in this context merely refers to something that arouses a person's emotions and causes them to act out in anger. (*People v. Hernandez, supra*, 183 Cal.App.4th at p. 1334.) Because this definition comports with the common understanding of provocation – the one our mothers used when they warned us "Don't provoke me" – the trial court was not required to define that term for the jury. (*Ibid*.)

The fact that a different standard of provocation applies depending on whether it is being used to reduce murder to manslaughter, or first degree murder to second degree murder, does not change our conclusion in this regard. That's because those differing standards are not part of the core definition of provocation; instead, they relate to how provocation is used in a particular legal context. And, as we have explained, the instructions given in this case adequately explained not only how provocation applies in the context of voluntary manslaughter, but also how it applies in the context of second degree murder. We believe the instructions on provocation were full and complete. They do not provide grounds for disturbing appellant's murder conviction.

10

*Prosecutorial Misconduct*

Next, appellant contends the prosecutor committed constitutionally offensive misconduct in closing argument by denigrating the defense and suggesting his attorney had fabricated evidence. The record shows otherwise.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citations.]'" (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

The alleged misconduct in this case started at the outset of the prosecutor's closing argument, when he stated, "This is not a close case. It's a really serious case, but it's not a close case. The killing of Octavio Alcala was an execution-style murder. It was brutal and it was vicious. And the evidence supporting that . . . is overwhelming . . . . [¶] The claimed defense [of] self- defense is an absolute embarrassment."

Those remarks drew an unspecified objection from defense counsel, which the trial judge overruled. However, the judge did remind the jury, "[W]hat counsel states is not evidence. You are to formulate your own opinions and conclusions." After that, the prosecutor returned to his point, saying appellant's claim of self-defense was "an embarrassment" and "an insult to [the jurors'] intelligence." He also characterized the claim as "outrageous" and "very predictable."

The prosecutor then took more specific aim at appellant's claim of self-defense. According to the prosecutor, this theory had one advantage for appellant, in that Alcala was no longer alive to refute his version of events. However, based on all the

11

evidence, the prosecutor asserted this theory still had "a ton of problems.  It's still not a good defense.  Like I said, it's outrageous."

At that point, defense counsel registered a "continuing objection," and the court excused the jury to discuss the issue with counsel.  Defense counsel insisted the prosecutor's argument "crossed the line," by unfairly impugning the defense, but the judge did not see it that way.  To the contrary, he agreed with the prosecutor that the subject remarks were "a fair attack on the evidence" and the viability of appellant's claim of self-defense; he did not perceive the prosecutor's remarks as a personal attack on defense counsel.  Therefore, he overruled defense counsel's objection.  In so doing, the judge also determined there was no need for him to admonish the jury any further with respect to this line of argument.

When argument resumed, the prosecutor immediately assailed appellant's claim of self-defense as "outrageous," "unsupported by the evidence," and "problematic." He then discussed the specific factual circumstances that he saw as undermining that defense.

Appellant contends this line of argument was fundamentally unfair because it denigrated the defense as a sham.  More particularly, appellant maintains the argument "effectively informed the jury that defense counsel had manufactured evidence in an effort to create doubt regarding . . . guilt . . ., thereby improperly implying that defense counsel had knowingly presented a false defense."[4]

As our Supreme Court has recognized, "It is misconduct when a prosecutor in closing argument 'denigrat[es] counsel instead of the evidence.  Personal attacks on opposing counsel are improper and irrelevant to the issues.'  [Citation.]"  (*People v. Welch* (1999) 20 Cal.4th 701, 753.)  However, defense counsel was not the target of the

---

[4] The Attorney General asserts appellant forfeited his right to challenge this argument on appeal by not requesting a curative instruction from the trial judge.  However, after hearing out the parties on this issue, the judge announced he was not going to admonish the jury any further with respect to the subject comments.  This obviated the need for defense counsel to seek a curative instruction.

prosecutor's challenged remarks in this case. Instead, the prosecutor was taking aim at appellant's claim of self-defense and what appellant himself alleged on the witness stand. Because there was no insinuation that defense counsel had done anything improper, there was no misconduct.

In any event, the prosecutor's remarks were not so egregious as to render appellant's trial fundamentally unfair in violation of his due process rights, nor is it reasonably likely he would have obtained a more favorable verdict in their absence. Strong language is available to both sides, and the language chosen by the prosecutor is not grounds for reversal.

*Ineffective Assistance of Counsel*

Appellant also argues his attorney was ineffective for failing to request further instructions to explain the concept of provocation as it relates to second degree murder, and for failing to ask the court to admonish the jury in response to the prosecutor's alleged misconduct in closing argument. But, as we have explained, the jury instructions were full and correct, and there was no prosecutorial misconduct. Therefore, defense counsel was not ineffective for failing to handle these issues any differently. (See generally *Strickland* v. *Washington* (1984) 466 U.S. 668 [a defendant alleging ineffective assistance of counsel must prove deficient performance and resulting prejudice].)[5]

*Fines and Fees*

Lastly, relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), appellant contends the trial court violated his due process rights by ordering him to pay $70 in court-related fees, a $300 restitution fine, and a $300 conditionally-stayed parole revocation fine, without determining whether he had the ability to pay those financial

---

[5] In his initial opening brief, appellant also argued his attorney was ineffective for utilizing an all-or-nothing trial strategy by essentially ignoring the lesser included offenses of second degree murder and voluntary manslaughter and seeking an outright acquittal based on self-defense. However, at appellant's request we struck that brief, and he abandoned that argument in his replacement brief.

penalties.  (See Pen. Code, §§ 1202.4, 1202.45, 1465.8; Gov. Code, § 70373.)  Appellant claims we should remand the matter to permit the trial court to conduct an ability-to-pay hearing, but for the reasons explained below, we find no reason to disturb the trial court's order.

As a preliminary matter, we note that unlike the defendant in *Dueñas*, appellant did not object to the financial penalties he challenges on appeal, which raises the specter of forfeiture.  (See generally *People v. Scott* (1994) 9 Cal.4th 331, 351–354 [to preserve a sentencing issue for appellate review the defendant must generally raise it in the trial court].)  Working on the assumption the *Dueñas* opinion announced a new constitutional principle that could not reasonably have been foreseen prior to its issuance, some courts have refused to apply the forfeiture rule when the defendant's sentence preceded that decision.  (See, e.g., *People v. Santos* (2019) 38 Cal.App.5th 923, 931-933; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138; *People v. Castellano* (2019) 33 Cal.App.5th 485, 489.)  However, appellant was sentenced on March 29, 2019, nearly three months after the *Dueñas* opinion came down.  Under these circumstances, appellant has forfeited his right to challenge his financial penalties on appeal.

Notwithstanding the forfeiture doctrine, appellant's *Dueñas* claim also fails on the merits.  In *Dueñas*, the court ruled imposing financial penalties on a criminal defendant without a prior determination of ability to pay violates due process.  While recognizing the state has a legitimate interest in imposing revenue-raising fees on people who break the law, the court stated, "Imposing unpayable fines on indigent defendants is not only unfair, it serves no rational purpose, fails to further [any] legislative [policy], and may be counterproductive."  (*Dueñas, supra*, 30 Cal.App.5th at p. 1167.)  Indeed, the court found the financial penalties at issue in that case did little more than punish the defendant for being poor and diminish her chances of successfully completing probation.  (*Id.* at pp. 1166-1172.)  Accordingly, *Dueñas* held, as a matter of first impression, trial

courts must conduct an ability-to-pay hearing before imposing such penalties on a criminal defendant. (*Ibid.*)

In *Dueñas*, however, the defendant was a poor, homeless woman who had suffered an array of "cascading consequences" because she could not afford to pay various fines and fees that were leveled against her for committing minor offenses related to her indigency. (*Dueñas, supra*, 30 Cal.App.5th at p. 1163.) Not only did she lose her driver's license, she was subjected to additional jail time and the prospect of civil collection efforts, all because she lacked the means to pay off her initial financial penalties. (*Id.* at pp. 1161-1164.) Given that her criminal history stemmed largely from the lack of monetary resources, the *Dueñas* court determined there was no rational basis for subjecting her to additional financial penalties in her current case, and therefore the trial court's decision to do so violated due process.[6]

While appellant is no stranger to the criminal justice system, there is nothing in the record suggesting his recidivism was attributable to any financial penalties he may have been ordered to pay in his prior cases. That is a key point of distinction from *Dueñas*, in which the financial penalties triggered by the defendant's initial crimes had severe consequences on her daily life and created the conditions that contributed to her current offense. (See *People v. Caceres, supra*, 39 Cal.App.5th at pp. 923, 928 [distinguishing *Dueñas* on that basis]; *People v. Kopp, supra*, 38 Cal.App.5th at p. 95 [same].)

---

[6] A number of courts have criticized the soundness of that ruling and rejected the very idea that due process is the appropriate measure by which the constitutionality of criminal fines and fees should be assessed. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320 [*Dueñas* improperly expanded the boundaries of due process]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060 ["*Dueñas* was wrongly decided" and should have based its analysis on the Eighth Amendment's excessive fines clause instead of the due process clause]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1034 (conc. opn. of Benke, J.) [same]; *People v. Caceres* (2019) 39 Cal.App.5th 917, 920 ["the due process analysis in *Dueñas* does not support its broad holding"]; *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 [same].) However, we need not weigh in on those issues, because even assuming the result in *Dueñas* was correct, appellant has not demonstrated the trial court violated his due process rights by failing to ascertain his ability to pay before ordering him to pay the financial penalties at issue in this case.

So we reject appellant's due process claim.  We also note that, having been sentenced to a term of 50 years to life, appellant will have plenty of time to pay off his financial penalties by working in prison.  (See *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 ["Wages in California prisons currently range from $12 to $56 a month."].) Therefore, any error in failing to ascertain his ability to pay was harmless at worst. (*Ibid.*; *People v. Aviles, supra,* 39 Cal.App.5th at pp. 1076-1077; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1486–1487.)

DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.