Filed 10/7/24  P. v. Henderson CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOMARI DAMON HENDERSON,<br><br>    Defendant and Appellant. | B326456<br><br>Los Angeles County<br>Super. Ct. No. BA480779 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed in part, vacated in part, and remanded.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Rodney Hudson entered a smoke shop in a part of Los Angeles claimed by Jomari Damon Henderson's gang. Henderson shot Hudson dead. A jury convicted Henderson of first degree murder and other crimes.

Henderson claims insufficient evidence shows he premeditated and deliberated this murder. He argues the trial court erred in failing to instruct the jury on voluntary manslaughter and in allowing the prosecution's gang expert to opine on his state of mind.

Henderson also levels various attacks on his sentence and on the trial court's strike finding under the Three Strikes law. (Pen. Code, §§ 667, subds. (b)–(i), 1170.12.) We use the term "strike" to refer to a "prior felony conviction" within the meaning of this law. (*People v. Watts* (2005) 131 Cal.App.4th 589, 592, fn. 2 (*Watts*).)

One of these latter claims has merit, so we reverse the strike finding, vacate Henderson's sentence, and remand the matter for a new determination of the prior conviction allegation and for resentencing. We affirm Henderson's convictions. Statutory citations are to the Penal Code.

I

We review the evidence favorably to the judgment. (See *People v. Jones* (2014) 223 Cal.App.4th 995, 997 (*Jones*).)

Indoor and outdoor surveillance cameras at the C&C Smoke Shop on Florence Avenue recorded the events leading to this shooting, which occurred on the evening of August 5, 2019.

Video shows an SUV with its lights on parked along a curb. A white car parks in front of the SUV. A man with red shorts (Hudson) gets out of the white car and walks towards the camera.

2

Henderson and a companion (William Ewell) leave the SUV and closely follow Hudson to the smoke shop.

Henderson is wearing a gray hoodie and a brightly colored shoulder bag.  Ewell is wearing black.  At the entrance to the shop, both men make a hand sign.

Upon entering the shop, Henderson immediately questions Hudson:  "You bang?"  "I don't bang, bruh" says Hudson.  Henderson replies, "Crackins my game.  What's popping?"  He walks outside and tells Hudson, "Yo, you need to come outside."  Ewell follows Henderson out, saying "On the Eight . . . ."  Henderson continues, "Oh, you tell people what what's up here; right?"  Then he asks Hudson, "Blood?"

Hudson joins them outside, but the cameras do not pick up what they are saying.  Henderson and Ewell begin walking away from the shop while Hudson goes back inside.  The other two turn around and follow Hudson.  Ewell enters the shop while Henderson waits outside with his left hand resting in his shoulder bag.

Inside the shop, Ewell tells Hudson, "On Bloods, watch how you address me, Bro.  This is the set, bro --."  He tells Hudson to calm down.  Hudson says, "My guy, listen" and "you niggas came at me --."  Ewell repeats, "This is the set, nigga."

Hudson defends, "Okay.  I know 'cause I'm in L.A., nigga --" "I told you niggas I don't gangbang."  "Period."  "I don't gangbang, nigga."  "I just told you niggas that."  Henderson continues to wait outside, still with his hand in his bag.

Two female customers urge the men to stop.  One of these witnesses later reported Hudson was nervous and looked like he did not want to leave the shop, the other men were aggressive, and one of them tried to fight Hudson.

Back on the scene, we see Ewell go outside with Henderson. Hudson calls out from inside, "Nigga. I'm in L.A. I get it. I get it. Get the fuck out of here." Then he asks the cashier for two Beverlies.

Henderson goes to the store entrance and again tells Hudson, "You come outside." The two go back and forth:

"[Hudson:] No, I know you feeling yourself. You got your bag with you. I get it, my nigga. You good.

"[Henderson]: Come straighten it outside, homie

"[Hudson]: I get it.

"[Henderson]: Why you chasing my car?

"[Hudson]: I get it.

"[Henderson]: Why you chasing my car, bro."

Henderson walks away from the store and down the sidewalk, his hand still in his bag.

Meanwhile Ewell faces Hudson at the doorway. A few feet separate them. Hudson looks at Ewell and says, "If I fuck you up, I'll fuck him up. You niggas wanna . . . . Fuck him up. Shit." He makes a quick movement forward. Ewell puts up his hands.

Hudson then walks away from Ewell and Henderson towards the white car. The two men let Hudson pass. Ewell heads to the driver's side of the SUV. Henderson heads towards Hudson in the dark. You can faintly see Henderson raise his left arm and reach towards Hudson. There is a flash by Henderson's extended arm. Then you hear three shots in quick succession.

Henderson gets in the SUV, which makes a U-turn out of its parking spot. Hudson also makes it into his car and drives off.

Hudson's girlfriend was waiting in the white car and heard the shots. She was scared. When Hudson returned, he had blood "coming out" at his groin and said, "he shot me." She applied

4

pressure to his wounds and called 911. After driving away from the shop, Hudson crashed into a pole.

Medical personnel testified about Hudson's critical injuries. Doctors kept him alive for more than a month, but eventually Hudson died from complications from his wounds.

The prosecution showed the jury text messages from a couple weeks after the shooting, which seem to show Henderson ("Jomari") admitting he shot someone three times, the victim got in his car and crashed it, and the shooting was on camera.

As part of the prosecution effort to explain this killing, Officer Eric Dapello established Henderson was a member of the Eight Trey Gangster Crips gang. Henderson had several tattoos referencing this gang. Both Henderson and Ewell "threw up" the hand sign for their gang as they followed Hudson into the smoke shop. The shop is located in territory claimed by Eight Trey. This territory is surrounded by enemy gangs on all sides, including a Blood gang, which made them "particularly territorial." Eight Trey feuds with most Blood gangs, who wear red, as Hudson did the night Henderson shot him. As Dapello explained,"[a]ny gang member would be hard-pressed not to engage somebody within their territory . . . that they thought might be a rival gang member."

Dapello also explained some of the terms Henderson and Ewell used. Gang members who ask another person if they "bang" are initiating a conflict with that person. Eight Trey Gangsters say "on the eight" to identify their gang affiliation. When they see someone wearing red and refer to "bloods," like Ewell did, they are identifying the person as a member of a Blood gang and are initiating conflict.

5

Hudson's girlfriend confirmed Hudson was not a gang member.

Henderson did not testify, and the defense called no witnesses.  Outside the jury's presence, Henderson admitted he had a prior felony conviction.

Defense counsel sought an instruction on imperfect self-defense.  The trial court denied the request, noting there was no sign Henderson had heard Hudson's last comment to Ewell, the shooting occurred later down the street, and the evidence of self-defense was too slight.

In closing argument, the defense argued the prosecution had not proved the gun police found was the gun that killed Hudson; nor did the prosecution prove Henderson killed him.  The defense did not argue Henderson shot because he felt threatened or enraged by Hudson.

The jury found Henderson guilty of first degree murder (§ 187, subd. (a), count 1) and determined he personally used a handgun (§ 12022.5, subd. (a)).  The jury also convicted him of assault with a firearm (§ 245, subd. (a)(2), count 2), firearm possession by a felon (§ 29800, subd. (a)(1), counts 3 and 4), and unlawful possession of ammunition (§ 30305, subd. (a)(1), count 5).  Finally, the jury found true four aggravating factors.

Before sentencing, Henderson admitted that he had a prior felony vandalism conviction and that he had admitted a gang allegation under section 186.22 in the same case.  The trial court found Henderson's admissions to be true and declined to dismiss the strike.

For count 1, the court sentenced Henderson to 60 years to life in prison.  This consisted of 25 years to life doubled under the Three Strikes law, plus 10 years for the firearm enhancement.

6

The court imposed a consecutive 16-month term for count 4 and a concurrent four-year term for count 5. The court stayed the sentences on the other counts.

## II

On appeal, Henderson argues insufficient evidence shows this murder was deliberate and premeditated first degree murder. He claims the trial court erred in many ways: in refusing to give lesser included offense instructions, in permitting expert testimony about his state of mind, in making its strike finding, in refusing to dismiss the prior strike conviction, and in imposing the upper term on the firearm enhancement. We find merit in certain arguments regarding the strike finding and therefore reverse this finding, vacate Henderson's sentence, and remand the matter for further proceedings, as detailed below.

## A

Henderson argues his murder conviction must be overturned because the trial court should have instructed the jury on the lesser included offense of voluntary manslaughter based on heat of passion and imperfect self-defense. These arguments lack merit.

Trial courts have a sua sponte duty to instruct on lesser included offenses when the evidence could lead a rational jury to conclude the defendant committed the lesser offense but not the greater one, provided substantial evidence supports the lesser offense. (See *People v. Williams* (2015) 61 Cal.4th 1244, 1263 (*Williams*).)

We independently review this issue. (*People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*).)

Murder may be reduced to the lesser included offense of voluntary manslaughter where the defendant acted in the heat of

7

passion. (§ 192, subd. (a).) This lesser offense has a subjective component and an objective component. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) Regarding the subjective component, the defendant must have acted under the actual influence of a strong passion inflamed by the victim. (*Id.* at p. 550; see also *Jones*, *supra*, 223 Cal.App.4th at p. 1000 [the subjective test "inquires whether the defendant in fact committed the act because he was provoked"].)

Imperfect self-defense is another basis for reducing murder to manslaughter. It too has a subjective component. (See *Thomas*, *supra*, 14 Cal.5th at pp. 386–387.) Imperfect self-defense occurs "when defendants act in the actual but unreasonable belief they are in imminent danger of great bodily injury or death." (*People v. Odell* (2023) 92 Cal.App.5th 307, 321.) It requires "your actual belief that you must defend against an imminent danger." (*Ibid.*; see also *People v. Oropeza* (2007) 151 Cal.App.4th 73, 82.)

The trial court properly omitted instructions on heat of passion and imperfect self-defense because there was insufficient evidence of the subjective component of these theories.

The evidence showed Henderson and Ewell followed Hudson into the smoke shop to confront him. Instead of attempting to make a purchase, they went directly to Hudson and asked if he was in a gang. Hudson repeatedly denied this, and Henderson repeatedly taunted him to come outside. Henderson paced outside the shop with his hand in his bag—which carried a gun—while Ewell and Hudson kept talking. Hudson did tell Ewell "[i]f I fuck you up, I'll fuck him up." But Henderson was far away at this point. It is unclear whether Henderson heard Hudson's statement. There was no sign this statement roiled

Henderson. Henderson did not testify, and no one testified along these lines. The videos show Henderson was calm before the shooting and seemingly focused on drawing Hudson outside; he was not overcome with extreme emotion, as his briefs argue.

Instead of confronting Hudson immediately when he finally got outside, Henderson let him pass and go to his car. Then he attacked. No evidence suggested Henderson believed he was in danger. He was armed with a gun, and his colleague was with him. Henderson started a two-on-one confrontation with an unarmed victim, who kept his distance from Henderson, and whose back was towards Henderson, at the time of the shooting.

Henderson's briefs argue he must have been acting under the influence of fear or extreme emotion based on Hudson's large size, his proximity, the possibility he was an armed gang member, his demeanor, and his threats to Ewell. This speculation does not give rise to a lesser included offense instruction. (See *Williams*, *supra*, 61 Cal.4th at p. 1264; see also *Thomas*, *supra*, 14 Cal.5th at p. 385 [speculative, minimal, or insubstantial evidence is insufficient].)

Instructions on imperfect self-defense and heat of passion were unwarranted. (See *Thomas*, *supra*, 14 Cal.5th 327 at p. 387 [manslaughter instruction unwarranted where there was no evidence defendant shot in the heat of passion or "actually believed—reasonably or unreasonably—that he was in fear of death or great bodily injury"]; *People v. Simon* (2016) 1 Cal.5th 98, 133–134 [trial court properly rejected self-defense instruction where the record was devoid of evidence tending to show defendant's subjective fear of the unarmed victim].)

9

B

Henderson next claims insufficient evidence shows this murder was deliberate and premeditated.

In reviewing claims of this type, we examine the record favorably to the judgment. We discern whether there is substantial evidence from which a rational juror could find the defendant guilty beyond a reasonable doubt. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068–1069 (*Mendoza*).) We do not resolve factual conflicts. Instead, we presume the existence of every fact in support of the verdict that reasonably could be inferred from the evidence. (*People v. Brady* (2010) 50 Cal.4th 547, 564 (*Brady*).)

Against this high burden, Henderson's insufficiency claim stumbles. His case has all three hallmarks of premeditation and deliberation: evidence of planning activity, preexisting motive, and manner of killing. (See *Mendoza*, *supra*, 52 Cal.4th at p. 1069.)

The surveillance videos provide evidence of planning and show the manner of Henderson's attack was to ensure death. Henderson waited in the SUV until Hudson arrived and left his car. Henderson pursued him with a gun, closely trailing Hudson into the shop. He confronted Hudson immediately about "banging," before Hudson ever spoke, and ignored Hudson's denials. He repeatedly told Hudson to come outside, where he waited calmly with his gun. The videos show Henderson pacing outside the shop, ready with his hand inside his shoulder bag. When Hudson completed his purchase and walked to his car, Henderson let him pass him and continue down the sidewalk, away from the shop's cameras. Then he shot Hudson three times

10

at close range, including in the abdomen and pelvis, with Ewell ready to drive them away.

A rational jury could have concluded this evidence showed reflection and a plan to kill a perceived rival. (See *Mendoza*, *supra*, 52 Cal.4th at p. 1069 [the test is reflection, not time; a brief interval can suffice].)

Motive reflecting deliberation and premeditation also was apparent. Henderson wanted to defend his gang territory: Hudson was wearing bright red shorts in territory claimed by Henderson's Crips gang. Red was the color of the Bloods, which were enemy gangs. Henderson's gang was surrounded by rivals, so there was extra pressure to guard its territory. As Henderson and Ewell pursued Hudson into the smoke shop, they "threw up" their gang's hand sign, advertising their mission, and immediately asked Hudson about his gang membership.

Henderson did not need to shoot Hudson on sight to have a gang motive. Nor did he need to be motivated by a desire for retaliation.

Henderson cites cases that are factually distinct and do not help him.

He argues for different inferences from the evidence that would violate our standard of review. (See *Brady*, *supra*, 50 Cal.4th at p. 561.) We reject Henderson's characterization of the evidence as showing a rash or impulsive response to a mere "brief verbal exchange" between "tough guys."

Ample evidence supports the jury's finding of premeditation and deliberation.

C

Henderson forfeited his next complaints about the gang expert's testimony. Even assuming no forfeiture, any error in

11

permitting this testimony was harmless.  We set the scene and then explain these conclusions.

At the end of Dapello's direct testimony, the prosecutor asked for a sidebar conference.  He said he had two remaining questions but wanted to avoid them if they were objectionable.  He explained both questions pertained to motive:  the motive of an Eight Trey Gangster Crip in approaching someone in Eight Trey territory wearing red shorts, and the motive of an Eight Trey Gangster in shooting a person in Eight Trey territory wearing red shorts after a confrontation.

The court responded these were "fair" questions because they did not ask about the defendant's motive.  Defense counsel responded:  "Okay.  Well, shouldn't it be asked like a hypothetical?"  The court remarked, "It's kind of like a hypothetical."  Defense counsel replied, "Okay.  That's fine."

The prosecutor resumed his examination and played clips from the surveillance video. Dapello identified Henderson as the person in the video with the gray sweatshirt and bag.  The prosecutor asked two questions in line with those he proposed.

In response to the second question, Dapello answered:

"So the way -- the currency that, I guess, gang members typically will deal in is not generally U.S. dollars or something, has more to do with respect.  So with respect, the other side of it being -- you know, adoration would be intimidation.  And both -- you can respect someone both ways.  You can be afraid of them, too afraid to do something or to stop them from doing something, or you can be -- adore them so much you would not do something.

"In this case, the gentleman in the gray sweater, with the bag, chose to intimidate the individual, came into the store, because he perceived him as a rival gang member.  In addition to

12

that, he ensured that everyone within the community saw that that person, wearing the wrong color in that area for his gang membership, being within that gang territory, that that individual would not be welcome because they are a perceived threat to the gangsters."

There was no objection or motion to strike this testimony.

Henderson forfeited his current complaint that Dapello's answer exceeded the permissible scope of expert testimony and inappropriately opined on his thoughts, perception, and motive. (See *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"].)

Even assuming no forfeiture, any error in admitting the testimony was harmless, as considerable other evidence showed a gang motive for Henderson's actions. This point did not hinge on the now-disputed sliver of testimony. Moreover, Dapello's answer easily could have been rephrased had counsel objected, and Henderson does not argue any error in admitting the testimony was incurable.

## D

The trial court must decide the prior conviction allegation anew.

Henderson attacks the court's strike finding on many fronts. We focus on the meritorious ground, after providing some background.

In 2015, Henderson pleaded no contest to vandalism over $400 (§ 594). The felony complaint for this case alleged Henderson had defaced a wall with graffiti. Henderson also admitted a gang enhancement under section 186.22, subdivision

13

(b)(1)(A).  In connection with his plea, the trial court warned Henderson his conviction would amount to a strike under the Three Strikes law.  This is due to the gang enhancement.  (See §§ 667, subd. (d)(1), 1192.7, subd. (c)(28).)

In the current case, the second amended information from September 2022 alleged Henderson previously had been convicted of a serious or violent felony (the gang-related vandalism) that qualified him for sentencing under the Three Strikes law.

Effective January 1, 2022, Assembly Bill No. 333 (2021-2022 Reg. Sess) (AB 333) altered the requirements for gang enhancements.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) Because Henderson does not argue specific statutory changes are critical to his appeal, we similarly do not detail the changes.

In August 2022, the California Supreme Court decided *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*), which clarified the showing required for gang enhancements when a defendant is a lone actor.  (*Id.* at pp. 957 & 964–965.)  *Renteria* raised the bar for finding an enhancement true in these cases. (*See id.* at pp. 965–969.)

In September 2022, after voir dire had begun and outside the jury's presence, the court raised Henderson's 2015 gang-related vandalism conviction.  It noted the case was final and this conviction was a "valid strike."  Defense counsel argued against this position, claiming Henderson "gets the benefit" of the changes to section 186.22 enacted by AB 333.  The trial court rejected this argument.

Before the verdict, Henderson waived his right to a jury trial on his prior conviction.  After the verdict, Henderson waived his right to a court trial.  He acknowledged he could double his

sentence by admitting his conviction.  He then admitted that he suffered a prior conviction for violating section 594, that the underlying vandalism charge was a felony, and that he admitted the gang allegation under section 186.22 in the same case.  Defense counsel concurred in the admissions and stipulated there was a factual basis for them.

The trial court accepted Henderson's admissions as true.  It denied Henderson's request to dismiss the prior conviction in the interests of justice and doubled Henderson's sentence on the murder count as a result.

On appeal, Henderson recognizes the Three Strikes law covers gang-enhanced felonies.  Or to rephrase it, typically a true finding on a gang enhancement will establish the underlying felony is a strike.  But Henderson claims insufficient evidence shows *his* conviction qualifies as a strike, and therefore his strike sentence is unlawful, due to the changes wrought by *Renteria* and AB 333.

Specifically, Henderson argues no evidence showed, and he did not admit, that he vandalized in 2015 for a gang's benefit and that he had the necessary intent, as required by *Renteria* for lone actor cases like his.  (See *Renteria*, *supra*, 13 Cal.5th at p. 973.)  In other words, the admissions and record before the court did not establish the conviction Henderson admitted constitutes a violation of section 186.22, subdivision (b), as revised by AB 333 and interpreted by *Renteria*.  Henderson's strike sentence is thus the result of improper judicial factfinding.  (See generally *People v Gallardo* (2017) 4 Cal.5th 120; see also *People v. Hiller* (2023) 91 Cal.App.5th 335, 345 (*Hiller*) ["Where the prior conviction is based on a guilty plea, the prosecution must prove the defendant admitted all elements" of the offense].)

Henderson maintains current law governs determinations of whether prior convictions constitute strikes.  He relies on *People v. Strike* (2020) 45 Cal.App.5th 143 (*Strike*), where the appellate court reversed a prior strike finding after concluding the defendant's admissions did not establish the offense of gang participation as narrowed by another Supreme Court case, *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*).  (See *Strike*, at pp. 146–150, 153–154; accord *People v. Farias* (2023) 92 Cal.App.5th 619, 648 & 652, review granted Sept. 27, 2023, S281027 (*Farias*) ["Though the record establishes defendant's 2009 conviction for gang participation, the documents provided do not prove that the conviction constitutes a violation of section 186.22, subdivision (a), as interpreted in *Rodriguez*"]; *Watts*, *supra*, 131 Cal.App.4th at pp. 596–597 [vacating defendant's sentence and remanding for further proceedings where the appellate court could not determine from the record whether the defendant's prior conviction qualified as a strike after a recent Supreme Court decision clarified the law on gang offenses].)

*Rodriguez* narrowed the scope of the gang participation offense (186.22, subd. (a)) by interpreting the statute to exclude lone actor cases.  (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1128 & 1138–1139.)  The result of both *Rodriguez*'s and *Renteria*'s narrowing of the gang statute is that certain convictions predating these decisions are inconclusive on their face as to whether they qualify as a strike.  (See *Strike*, *supra*, 45 Cal.App.5th at p. 150.)

The prosecution's answer to this argument is Henderson admitted his prior conviction qualified as a strike*,* and he is bound by this admission.  This mischaracterizes Henderson's admissions, which we outlined above.  Henderson did not admit

16

his prior conviction was a strike or a qualifying conviction under the Three Strikes law.  (Cf. *People v. Scott* (2023) 91 Cal.App.5th 1176, 1181, review granted Sept. 27, 2023, S280776 (*Scott*) [defendant "specifically said, 'I admit the strike prior' "].)

The parties point to cases that reach different conclusions about whether a true finding that a prior gang offense qualifies as a strike requires proof of the additional elements required by AB 333.  (Compare *Farias*, *supra*, 92 Cal.App.5th at pp. 650–652, review granted Sept. 27, 2023, S281027, with *Scott*, *supra*, 91 Cal.App.5th at pp. 1180–1184, review granted Sept. 27, 2023, S280776.)  The Supreme Court has taken up the issue in *People v. Fletcher* (2023) 92 Cal.App.5th 1374, review granted Sept. 27, 2023, S281282.  But that issue is not dispositive here, where Henderson also points to an intervening judicial clarification of the law on gang enhancements.  (See *Scott*, *supra*, at pp. 1183–1184 [*Strike* and *Watts* not controlling "because they dealt with changes in the judicial interpretation of a statute, rather than amendments to the statute itself"; while judicial decisions operate retrospectively to say what a law always meant, statutory amendments do not].)

The prosecution argues Henderson forfeited some of his claims regarding the strike.  Henderson's counsel challenged the validity of his prior conviction at the outset of trial, and the trial court quickly batted down this challenge.  Although Henderson did not re-urge this challenge after trial, he did not forfeit this claim.  (See *Hiller*, *supra*, 91 Cal.App.5th at pp. 344–345.)

*Strike* and *Watts* dictate the result here.  The strike finding and Henderson's sentence—which accounts for this finding— cannot stand.  We therefore reverse this finding and remand this matter for a new determination of whether Henderson's 2015

17

gang-related vandalism conviction amounts to a strike, applying the current law on section 186.22 gang enhancements. The trial court then must resentence Henderson. Rehearing the prior conviction allegation may change the sentencing calculus.

We do not reach Henderson's other attacks on the strike finding and on his sentence.

## DISPOSITION

We reverse the trial court's finding on the prior conviction allegation, vacate Henderson's sentence, and remand this matter for further proceedings consistent with this opinion. We otherwise affirm the judgment.


WILEY, J.


We concur:


STRATTON, P. J.


VIRAMONTES, J.