Filed 3/20/26  P. v. Franco CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D086915 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BAF2001346) |
| ALBERTO FRANCO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Riverside, Samah Shouka, Judge.  Affirmed with instructions to modify.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant Alberto Franco.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Christian Anselmo Gomez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Donald W. Ostertag and Robin Urbansksi, Deputy Attorneys General, for Plaintiff and Respondent.

Christian Anselmo Gomez and Alberto Franco were convicted of first degree murder (Pen. Code,[1] § 187, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), and attempted kidnapping (§§ 665 & 207, subd. (a)). On appeal, appellants collectively contend: 1) the court insufficiently instructed the jury on provocation's effect on the degree of murder; 2) the court failed to sua sponte instruct on the lesser included offense for attempted kidnapping; 3) the court's incorrect instruction on attempted kidnapping was prejudicial; 4) the court miscalculated Gomez's sentence for the attempted kidnapping count; 5) the attempted kidnapping and murder were part of a continuous course of conduct and thus warranted a single sentence; and 6) the evidence was insufficient to support Franco's conviction as an accomplice to felony murder.[2]

We direct the trial court to modify the judgment to correct a sentencing error on Gomez's sentence for attempted kidnapping. We otherwise affirm.

FACTUAL AND PROCEDURAL HISTORY

In October 2020, Salvador Cortez and his associate robbed Gomez. After the incident, Gomez told his roommate Franco about the robbery.

Two days later, Franco sent a text message to an unknown party indicating he wanted to find Cortez "right away" to make Cortez "pay."

Hours after the text message, Cortez showed up uninvited to Gomez and Franco's home. All three men went to the garage, where Franco and Gomez beat Cortez with pipes. When the garage door opened, Franco and Gomez continued their assault outdoors until distracted by witnesses. Cortez

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

[2]     Franco joined all of Gomez's contentions.

managed to escape by foot to a nearby restaurant. Gomez grabbed a rifle and Franco drove them to pursue Cortez.

Gomez and Franco yelled at Cortez to get in the car, but Cortez kept refusing and walking away. When Cortez started running around a car, Gomez and Franco chased after him. Then Gomez shot Cortez multiple times.

Leaving Cortez to die, Franco and Gomez drove away and crashed the car. Law enforcement found the appellants hiding about one-quarter mile from the accident site.

The autopsy of Cortez revealed seven lacerations to the head and 15 gunshot wounds.

At trial, Gomez testified that he wanted Cortez to get in the car so Cortez could go to law enforcement and then the hospital.

The court instructed the jury on attempted kidnapping, murder, manslaughter, and that provocation can reduce the degree of murder or reduce murder to manslaughter. Trial counsel did not request any modifications or object to the challenged instructions.

The People presented to the jury alternative theories as to how the jury could convict Gomez of first degree murder, either via felony murder or premeditated murder. For Franco, the People pursued the theory of felony murder or aiding and abetting murder.

Gomez's counsel argued that Gomez had been provoked by Cortez due to having been robbed days earlier and thus acted with rash impulse rather than premeditation.

The jury convicted Gomez and Franco of first degree murder (count 1; § 187, subd. (a)), assault with a deadly weapon (count 2; § 245, subd. (a)(1)), and attempted kidnapping (count 3; §§ 665 & 207, subd. (a)). For Gomez, it

3

found true the following enhancements: personal use and discharge of firearm (§ 12022.53, subd. (d); count 1), infliction of great bodily injury (§ 245, subd. (a); count 2), and personal use of firearm (§ 12022.53, subd. (b); count 3). For Franco, the jury found true the principal was armed (§ 12022, subd. (a)(1); counts 1 & 3) and that Franco inflicted great bodily injury (§ 12022, subd. (a)(1)).

The court sentenced Gomez to the following: 50 years to life for count 1 (25 to life for the charge itself plus 25 to life for the gun allegation); six years for count 2 (three years for the charge itself plus three years for the great bodily injury allegation); and "one-third the mid[dle] term of two years and six months" for count 3. The 10-year gun allegation was stayed because the court already imposed the section 12022.53 gun allegation for count 1. The court found count 2 to be the principal term for the determinate sentence. The court elected to run the sentences consecutively. Gomez was sentenced to a total of eight years and six months for the determinate term, plus 50 years to life.

For Franco, the court imposed 26 years to life for count 1, which included 25 years to life for the charge plus one year for the armed principal allegation; three years for the middle term for count 2, plus three years for the great bodily injury allegation; and the middle term of two years and six months for count 3. The one-year armed principal allegation was imposed and stayed. The court ran count 3 concurrently with count 2 and counts 2 and 3 concurrent to count 1 for a total of 26 years to life for Franco.

Franco and Gomez appealed.

4

DISCUSSION

I.

*The court did not err with its instructions on provocation*

Gomez, joined by Franco, contend that 1) CALCRIM No. 522 is incomplete and misstates the law by failing to instruct that the test for provocation contains no objective element; 2) the combination of CALCRIM Nos. 200, 521, 522, and 570 likely led the jury to use an incorrect standard of provocation to determine whether Gomez was sufficiently provoked to reduce the charge from first degree to second degree murder; and 3) the court had a sua sponte duty to provide additional instruction on provocation because it is a technical legal term.

We review instructional error de novo. (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 557 (*Ocegueda*).) We view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction impermissibly. (*Ibid.*) We assume jurors are intelligent and capable of understanding and correlating instructions. (*Ibid.*)

We first summarize the substantive law and corresponding instructions.

If a defendant is subjectively provoked, it can negate the premeditation and deliberation element of first degree murder. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000–1001 (*Jones*).) In other words, subjective provocation can reduce first degree murder to second degree. (*Id*. at p. 1000.) Murder can be reduced to manslaughter if the defendant kills due to "sudden quarrel" or "heat of passion." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Heat of passion requires both subjective and objective provocation. (*Ibid.*)

5

Accordingly, CALCRIM No. 521 explains that the difference between first and second degree murder is whether the defendant deliberated and premeditated. CALCRIM No. 522 instructs that provocation can reduce the degree of murder.[3] CALCRIM No. 570 sets forth both subjective and objective elements, explaining that murder can be reduced to voluntary manslaughter if the defendant was provoked and a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

Gomez argues that CALCRIM No. 522 itself is deficient because it fails to articulate that only subjective provocation is needed to reduce first degree murder to second degree murder. He claims that when this instruction was provided with CALCRIM Nos. 200, 521, and 570, it likely misled the jury even further. CALCRIM No. 200 says, "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions." However, per Gomez, the only "definition" of provocation appears in CALCRIM 570, which contains the subjective plus objective test for reduction to manslaughter. Therefore, Gomez asserts, the jury was likely to assume the higher manslaughter standard for provocation was the same as that for murder.

---

[3] CALCRIM No. 522 in its original form states: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]."

Multiple courts have rejected similar challenges to instructions on provocation for murder.  (See e.g., *Ocegueda, supra*, 92 Cal.App.5th 548; *People v. Jones* (2014) 223 Cal.App.4th 995; *People v. Hernandez* (2010) 183 Cal.App.4th 1327.)  Gomez's only novel argument is the added impact of CALCRIM No. 200 and whether the court had a sua sponte duty to provide further instruction to ameliorate any confusion about the standards.

We examine Gomez's argument in full.

CALCRIM No. 521 instructs that to act deliberately means the defendant "carefully weighed the considerations for and against (his/her) choice and, knowing the consequences, decided to kill."  It also states the defendant premeditated "if (he/she) decided to kill before completing the act[s] that caused death."  CALCRIM No. 522 explains that if the jury concludes the defendant committed murder but "was provoked," consider the provocation in determining whether the murder was first or second degree.

Considering whether the defendant himself or herself, rather than a person of average disposition, "was provoked" connotes a subjective standard. (See CALCRIM No. 522.)  The phrase "was provoked," on its face, signals actual provocation.  (See *ibid*.)  Furthermore, a reasonable jury would understand that logically, a defendant who was provoked enough to kill did not premeditate and deliberate.  (*Jones, supra*, 223 Cal.App.4th at p. 1001; *Hernandez, supra*, 183 Cal.App.4th at p. 1334 [upholding combination of CALCRIM Nos. 521 and 522].)  Premeditation is a calculated decision, while provocation is an arousal of emotion that can lead to rash impulse. (*Hernandez,* at p. 1334.)

Gomez points out that CALCRIM No. 570, which he claims provides a legal definition of provocation, was not at issue in *Hernandez.*  He asks us to

7

distinguish *Hernandez* and conclude that the court had a sua sponte duty to further clarify the standards for provocation.

Generally, there is no sua sponte duty to instruct on provocation. (*People v. Rogers* (2006) 39 Cal.4th 826, 877–879.)  If the court has sufficiently instructed the jury and there is no request to give clarifying or amplifying instructions, the court has no further duty to instruct. (*Hernandez, supra,* 183 Cal.App.4th at p. 1331; *Ocegueda, supra*, 92 Cal.App.5th at p. 560.)  Gomez's argument also fails because here, none of the provided instructions defined provocation itself or flagged "provocation" as a legal term with a meaning different from everyday use.  Moreover, *Jones, supra*, 223 Cal.App.4th at pages 999, 1001 and *Ocegueda,* at page 558, concluded that CALCRIM No. 570 properly lays out a separate test for manslaughter and is not likely to confuse the jury.

We accordingly reject Gomez's claim that he was denied his right to due process, fair trial, or a complete defense.  Given our conclusions, we need not reach the issue of forfeiture, prejudice, or ineffective assistance of counsel.

## II.

### *The court had no duty to instruct on the lesser included offense of attempted false imprisonment*

Appellants contend that the trial court failed to sua sponte instruct on a lesser included offense for the attempted kidnapping charge.

The court has an obligation to instruct on a lesser included offense if there is substantial evidence that would absolve the defendant of the greater offense but not the lesser. (*People v. Souza* (2012) 54 Cal.4th 90, 115–116 (*Souza*).)  The evidence is substantial when a reasonable jury could find guilt for the lesser, but not greater offense.  (*Ibid*.)  We review de novo whether the trial court failed to instruct on the lesser offense.  (*Ibid*.)  If there is any doubt

8

as to whether the evidence was sufficient to justify the instructions, we resolve these in favor of the defendant. (*People v. Steskal* (2021) 11 Cal.5th 332, 345.)

False imprisonment is a lesser included offense of kidnapping (*People v. Jandres* (2014) 226 Cal.App.4th 340, 362), with the distinction being the asportation element. (*People v. Reed* (2000) 78 Cal.App.4th 274, 284.) Kidnapping requires that the defendant move the victim a substantial distance. (*People v. Martinez* (1999) 20 Cal.4th 225, 237.) When considering whether the victim was substantially moved for the purpose of kidnapping, the jury may consider the actual distance the victim was moved, whether the movement would increase the risk of harm, decrease the chances of detection, increase the danger of a foreseeable escape attempt, or increase the opportunity to commit more crime. (*Ibid.*) The jury was instructed on these factors with CALCRIM No. 1215, which sets out the elements of kidnapping.

Examining the evidence in the light most favorable to the appellants, a reasonable jury could find these factors for asportation were met.

Gomez argues on appeal that there was no direct evidence that appellants intended to move Cortez any distance, and that their actions were consistent with an intent merely to falsely imprison him. But Gomez himself testified that he wanted Cortez to get in the car so Gomez could transport Cortez to law enforcement, then the police could take Cortez to the hospital. Even if the jury were to credit such a benevolent motive, Gomez's claim does not negate the force or fear element of moving an unwilling victim, and provides direct evidence as to the element of asportation.

Multiple witnesses testified about how Cortez actively tried to create distance between himself and his attackers. Cortez kept walking away and responding, "No," despite Gomez being armed. There is no dispute that

9

Cortez had barely escaped a beating that caused seven lacerations to the head. He was observed bleeding onto his face and limping or staggering. As confirmed by an eyewitness and video, when Cortez started running around a car to evade his would-be kidnappers, they chased after him.

Had Cortez complied with the appellants' demands, he would have been alone with the men who had caused injuries that could have been fatal on their own if left untreated. He would have been isolated from witnesses and possible intervenors, and easier to move to a more secluded location where the appellants could attack him further. Any person in Cortez's position would foreseeably want to escape. A reasonable jury could find that had the appellants successfully moved Cortez to the car, it would have been against his will, and that distance alone could have been substantial under the circumstances.

There was sufficient evidence to support a verdict of attempted kidnapping. (See *Souza, supra*, 54 Cal.4th at pp. 115–116 [sua sponte duty triggered if there is substantial evidence to convict on lesser included offense, *but not* greater].) Thus, the court had no sua sponte duty to instruct on attempted false imprisonment. Accordingly, we reject appellants' conclusory claims of any Fifth, Sixth, or 14th Amendment violations.

## III.

### *The error from the inconsistent instructions for attempted kidnapping was not prejudicial*

Although any attempt crime requires that the People prove specific intent (*People v. Fontenot* (2019) 8 Cal.5th 57, 69), the trial court listed the attempted kidnapping count under the counts that required general intent when providing an instruction that explained which counts required general

or specific intent.[4]  Appellants contend, and the People concede, it was error to give conflicting instructions in such a manner.  We agree.  The question remains whether this error was prejudicial.

As discussed above, we independently review instructional error. (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)  If instructions on the element of specific intent are incorrect or inconsistent, we must reverse unless the error is harmless beyond a reasonable doubt.  (*People v. Lizarraga* (1990) 219 Cal.App.3d 476, 482.)  We determine whether there is a reasonable likelihood the jury misapplied the challenged instruction in a manner that violates the Constitution.  (*People v. Mills* (2012) 55 Cal.4th 663, 677.)  We do not assume the jury followed instructions that were inconsistent with other correct instructions and arguments.  (*Id.* at p. 680.)  Rather, we review the entire record and the instructions in context.  (*Ibid.*)

Here, the court correctly and separately instructed the jury on attempted kidnapping via a modified version of CALCRIM No. 460.  This instruction on the elements of attempted kidnapping did not use the phrase "specific intent" but stated that the People must prove:  (1) "The defendant took a direct but ineffective step toward committing Kidnapping" and (2) "The defendant intended to commit Kidnapping."  This instruction unequivocally apprised the jury of their task, as did the attorneys.

The prosecutor and both defense counsel emphasized the specific intent elements of attempted kidnapping.  (*People v. Chavez* (2004) 118 Cal.App.4th 379, 388 [closing arguments are relevant to evaluating prejudice].)  The prosecutor argued that the defendants "took a direct but ineffective step toward kidnapping and that they intended to commit kidnapping."  Gomez's

---

4    This sole error was made in CALCRIM No. 252, titled "Union of Act and Intent:  General and Specific Intent Together."

counsel explained the elements of a completed kidnapping to argue that the appellants did not attempt to do such. Franco's counsel stated, "Attempt is [the] People must prove the defendant took a direct but ineffective step toward kidnapping, and the defendant intended to commit the kidnapping. He then argued there was no kidnapping or attempt at kidnapping because "it was never the intent of Mr. Gomez or Mr. Franco in this matter."

There is little dispute as to the factual basis behind the kidnapping charge. Gomez himself testified that he was carrying a rifle when he told Cortez to get in the car, Gomez wanted to take Cortez to the police, and Cortez said "No," to getting in the car. By Gomez's own admission, his intent was to transport an unwilling Cortez.

The instructional error was harmless beyond a reasonable doubt. With the balance of the instructions, the clarifications by counsel, and the evidence showing a specific intent to kidnap, there was no reasonable likelihood the jury would misapply the erroneous instruction.

IV.

*The court miscalculated the sentence for Gomez on count 3*

Gomez contends, and the People concede, that the trial court miscalculated his sentence for count 3, the attempted kidnapping. We agree.

We review unauthorized sentences de novo. (*People v. Tua* (2018) 18 Cal.App.5th 1136, 1140.) A computational error that leads to an unauthorized sentence can be corrected at any time. (*People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205.)

Kidnapping is punishable by three, five, or eight years in state prison. (§ 208, subd. (a).) The sentence for an attempted offense is one-half of the sentence for the completed offense. (§ 664.) Thus, attempted kidnapping would be punishable by 18 months, 30 months, or four years. However, any

subordinate counts to be served consecutively are only given one-third of the middle term. (*People v. Felix* (2000) 22 Cal.4th 651, 655; see section 1170.1, subd. (a).)

Here, the trial court used count 2 (assault with a deadly weapon) as the principal count for the determinate term. This made count 3, the attempted kidnapping, a subordinate term. Since the court imposed a consecutive sentence for this count, the court was only authorized to impose one-third of the middle term, which is 10 months. However, the court stated one-third the middle term was two years and six months. The court clearly intended to pronounce the correct sentence but miscalculated or misspoke as to the actual length of the term. The abstract of judgment reflects the incorrect calculation and should be amended to reflect 10 months for count 3. (See *People v. Wilson* (2013) 219 Cal.App.4th 500, 518 [reviewing court has authority to correct unauthorized sentence].)

V.

*The court did not err in imposing separate sentences for the murder and attempted kidnapping*

Gomez and Franco contend that the trial court erred by not staying the sentence on either the murder or the attempted kidnapping because both crimes were committed during a continuous course of conduct with a single intent and objective. Franco also argues that punishing for both felony murder and the target offense of attempted kidnapping constitute double jeopardy and violates section 654.

We use the substantial-evidence standard to assess the trial court's factual findings, implicit or explicit, of whether there was a course of conduct with a single criminal objective. (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) We review the trial court's legal conclusions de novo. (*Ibid.*) We

13

look at the entire record in the light most favorable to the verdict. (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1524 (*Perry*).)

A. *Continuous course of conduct*

Section 654, subdivision (a) prohibits multiple punishments for actions that fall within the same course of conduct in which the perpetrator had a single intent and objective. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) A defendant may be punished only once if all the crimes were merely incidental to or were the means of accomplishing a single objective. (*Ibid.*) If a defendant had multiple, independent criminal objectives, he or she may be punished for each crime, even if the crimes had common acts or were parts of an otherwise indivisible course of conduct. (*Perry, supra*, 154 Cal.App.4th at p. 1525.) The applicability of section 654 turns on whether the defendant had multiple criminal objectives, not whether an act occurred during the commission of a crime. (*People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1007.)

Gomez argues that the severity of Cortez's injuries from the garage beating, appellants' pursuit of Cortez after the escape, and the attempted kidnapping and ensuing murder show that Gomez's sole intent and purpose was to kill Cortez.

We disagree. There was sufficient evidence to support a finding that Gomez formed the intent to kill after the kidnapping attempt failed. Such a finding would be consistent with the theory of premeditated murder. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 ["premeditation and deliberation do not require any extended period of time"].) Indeed, if the sole intent had been to kill Cortez, Gomez could have shot him to death in the garage. The evidence was also sufficient to support a finding that appellants had a separate objective to the kidnapping such as an intention to abuse

14

Cortez elsewhere. Attempting to kidnap the victim was not an integral part of killing him; one crime was not necessarily a means to commit the other.

The court did not err by imposing consecutive sentences for Gomez or concurrent sentences for Franco.

We next turn to the analysis specific to felony murder.

B. *Felony murder's impact on section 654*

Section 654 prohibits punishment for both murder and the target offense when the prosecution relies *only* on a theory of first degree felony murder. (*People v. Carter* (2019) 34 Cal.App.5th 831, 841 (*Carter*).) However, if the prosecution offers an alternate theory such as premeditation, and there is evidence to support the alternate theory, then the court may properly impose separate sentences for the murder and the underlying felony. (*Ibid.*)

In *Carter*, the jury convicted the defendant of first degree murder and attempted first degree robbery but found not true the allegation that he personally and intentionally discharged the firearm. (*Carter, supra*, 34 Cal.App.5th at p. 838.) The victim died of gunshot wounds and the evidence showed that the actual shooter could have been the defendant or two others involved in the attempted robbery. (*Id.* at pp. 836–837.) Thus, the defendant reasoned that the only way the jury could have reached a verdict of first degree murder was by relying on the felony-murder theory rather than the premeditation theory. (*Id.* at pp. 840, 846.) However, *Carter* explained that even if a jury finds a count or enhancement untrue, this simply indicates that the jury was unable to find the charges true beyond a reasonable doubt. (*Id.* at p. 845.) The double jeopardy clause does not prohibit a sentencing court from relying on facts supporting a charge for which the defendant was acquitted because the sentencing court need only find such facts to be true by a preponderance of the evidence. (*Ibid.*)

15

Franco argues that if one or more jurors based their verdict of murder on a theory of felony murder, the trial court violated his right against double jeopardy and his rights to due process and to trial by jury when it imposed a consecutive sentence. But *Carter* concluded that where substantial evidence supported the court's sentencing determination, it was not necessary for the jury to agree on one of multiple theories of murder presented to them. (*Carter, supra*, 34 Cal.App.5th at p. 846.)

Here, the jury found beyond a reasonable doubt that appellants committed murder and attempted kidnapping, which set the maximum exposure. As the *Carter* court further noted, section 654 acts to reduce, not increase, the penalty beyond the amount permitted. (*Carter, supra*, 34 Cal.App.5th at pp. 845–846.) Thus, there was no impermissible judicial fact finding that would violate the Sixth Amendment. (See *ibid*.)

In the instant case, the trial court addressed section 654 and found that Gomez committed several acts at different locations. For the murder count, he shot at Cortez. The assault causing great bodily injury occurred in a separate location where he beat Cortez with pipes. The attempted kidnapping occurred when he was threatening Cortez at gunpoint to get in the vehicle. It found these offenses were independent of one another. As to Franco, the court found section 654 did not apply for the same reasons, that two of the crimes were in geographically distinct locations. It also noted Franco was the one chasing after and cornering Cortez sufficient to enable Gomez to shoot Cortez 12 times.[5]

Franco argues that the trial court's finding that the murder and attempted kidnapping had separate intents and objectives is tantamount to

---

[5]    The autopsy report indicated 15 gunshot wounds.

the court rejecting the felony murder theory such that Franco's liability for the murder would stem from the attempted kidnapping (rather than aiding and abetting the murder).

This argument fails. The two theories of murder are not mutually exclusive because one can premeditate murder (or aid and abet premeditated murder) while also intending to commit kidnapping. Also, the relevant question is not whether any of the jurors relied on the felony murder theory to reach the verdict, but whether there was sufficient evidence to support the alternative theory of premeditation. (See *Carter, supra*, 34 Cal.App.5th at p. 841.)

There was substantial evidence to support the theories of both premeditation and felony murder. Gomez impliedly concedes the premeditation theory with his argument that he only had one objective—to kill Cortez. Regardless, the relevant details are uncontested. Gomez and Franco beat Cortez severely and chased him down, and Gomez shot Cortez while Cortez was trying to evade the appellants' efforts to get Cortez in the car.

## VI.

*The evidence is sufficient to support Franco's conviction as an accomplice to felony murder*

Franco separately contends there was insufficient evidence to support his conviction as an accomplice to felony murder.

When we review a challenge to whether the evidence was sufficient, we view the evidence in the light most favorable to the verdict and decide whether any rational jury could find elements of the crime true beyond a reasonable doubt. (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.)

17

The People relied on alternative theories for the murder charges against Franco. One was that he directly aided and abetted Gomez, the main perpetrator. The other was that Franco was guilty of felony murder. To hold Franco liable for felony murder, the People had to prove that he was a "major participant" in the attempted kidnapping, the underlying offense, and that he "acted with reckless indifference to human life." (See § 189, subd. (e)(3).)

In *People v. Banks* (2015) 61 Cal. 4th 788, 803 and *People v. Clark* (2016) 63 Cal.4th 522, 618–623, our Supreme Court listed factors that may be used to determine whether an accomplice qualifies as a major participant and whether they acted with a reckless disregard for human life. The collective factors include: the defendant's role in planning the criminal enterprise that led to death; the defendant's role in supplying or using lethal weapons; whether the defendant was aware of the particular dangers of the nature of the crime, weapons used, or past experience of conduct of other participants; the defendant's knowledge of his or her cohort's propensity for violence or likelihood of using lethal force; whether the defendant was present at the scene of the killing, in a position to facilitate or prevent the murder or help the victim, any efforts the defendant made to minimize the risk of violence during the commission of the felony and whether his or her actions or inactions played a role in the death; the defendant's actions after the use of lethal force; and the length of the interaction between the perpetrators and the victims. (*Ibid.*) None of these factors is dispositive. (*People v. Strong* (2022) 13 Cal.5th 698, 706 (*Strong*).)

Determining whether the defendant acted with reckless indifference to human life has both subjective and objective elements. (*In re Scoggins* (2020) 9 Cal.5th 667, 677.) Simply knowing the foreseeable risk of death that is inherent to any violent crime is not enough to establish reckless indifference

18

to human life.  (*Ibid*.)  We examine the totality of the circumstances to ascertain whether a perpetrator was willing to kill or help kill to obtain a goal, even if the defendant did not specifically want death to result.  (*Strong, supra*, 13 Cal.5th at p. 706.)

Here, the facts speak for themselves.

Franco knew about the robbery with Gomez, which meant he would have been on notice that Gomez held a grudge against Cortez.  Franco had his own vendetta, as evidenced by the text message he sent hours before the shooting.  It reads, " 'Where you at foo?  Ay, I need to find Sleepy or Blanco or both, even better.  This foo are going to pay.  It's serious.  I need you to keep a lookout and tell me, "right away" where these putos are at.' "  "Sleepy" was Cortez's moniker.  "Puto" is a derogatory term in Spanish.

Franco, alongside Gomez, beat Cortez with metal pipes and fists until witnesses yelled at them to stop.  Only then did the appellants pause long enough for Cortez to get away.  The bleeding Cortez limped his way across an alley and flipped himself over a low fence.  By this point, the victim was clearly injured and no threat.  However, Gomez armed himself with a loaded rifle.  Franco and Gomez both jumped in a car, then Franco backed the car out so fast that the tires screeched.

Franco drove to the other side of the wall as Cortez ran further.  Gomez had the rifle in his hands when he approached Cortez.  Franco wore a bandana partially covering his face.  Gomez and Franco yelled at Cortez to get in the car, but Cortez kept refusing and walking away.  When Cortez started to run around a car, Gomez and Franco chased after him.  Then Gomez shot Cortez 15 times while Cortez screamed, "No."

Rather than trying to stop the shooting or help the victim, Franco fled with Gomez.  They crashed into a mailbox, abandoned the car, and walked

19

one-quarter mile to hide. In the bushes across the street from the car, law enforcement found a bandana believed to be the one Franco was wearing. This suggests Franco wanted to avoid being linked to the crime.

Franco did much more than merely participate in an attempted kidnapping. He actively created an inherently dangerous and lethal situation. With his own violent actions, he put Cortez's life at risk and gave Cortez every reason to flee and possibly expose the attack. Franco had just as much reason as Gomez to want Cortez silenced or at least moved away from onlookers.

We conclude the verdict was supported by sufficient evidence. There was no state or federal due process violation as claimed by Franco.

DISPOSITION

The clerk of the superior court is directed to prepare an amended abstract of judgment for Gomez to reflect the correct computation of 10 months for count 3. A certified copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

In all other respects, we affirm.

KELETY, J.

WE CONCUR:

DO, Acting P. J.

RUBIN, J.